**Terry P. DUGGINS, Respondent,**

**v.**

**Leonard SIMONS et al., Appellants.**

**No. 57174.**

Supreme Court of Missouri, Division No. 1.

Dec. 16, 1974.

Donald W. Giffin, Kansas City, for respondent; Spencer, Fane, Britt & Browne, Kansas City, of counsel.

W. Raleigh Gough, Kansas City, for appellants.

BARDGETT, Presiding Judge.

This is an appeal by defendants, owners of certain real estate, who had retained plaintiff, a real estate broker, to sell this real estate for defendants, from a judgment in favor of plaintiff on plaintiff's cause of action of $10,316.74, representing broker's commission and interest, and in favor of plaintiff and against defendants on defendants' counterclaim for damages of $32,500, and in favor of plaintiff on defendants' equitable cross-petition for cancellation of the contract between plaintiff and defendants. The appeal was filed during the time that the jurisdiction of this court under Art. V, sec. 3, V.A.M.S., and sec. 477.040, RSMo 1969, V.A.M.S., included appeals in which the amount in controversy exceeded $30,000. This court has jurisdiction.

One party to this action is Terry P. Duggins, respondent and plaintiff below, who is a real estate broker in Kansas City, Missouri, hereinafter referred to as plaintiff.

The appellants (defendants below) are eleven persons residing in Michigan, who

owned five apartment buildings and a vacant lot in Kansas City, hereinafter referred to as defendants. Leonard Simons, one of the defendant owners, is a lawyer in Detroit, Michigan, and acted as spokesman and agent for all the defendants in their dealings with plaintiff.

Robert and Beverly Ogren, his wife, are the persons who signed a real estate sales contract for the purchase of defendants' property. The sale was not consummated and the Ogrens are not parties to this suit.

Plaintiff sued defendants for a real estate broker's commission. The plaintiff's petition was entitled "Petition on a Note" and it alleged: On April 23, 1968, defendants signed and delivered to plaintiff their promissory note, a copy of which was attached to the petition, whereby defendants promised to pay plaintiff or his order $8,400, payable at the rate of $700 per month starting June 1, 1968, and each succeeding month thereafter until paid; that the note provided that in the event of default on any payment the entire amount would be due and payable; that no amount of the note was paid; that the note was past due; and that plaintiff was the holder and owner thereof. The note provided for interest at eight percent per annum after default. Plaintiff prayed judgment for $8,400 with interest thereon from June 1, 1968.

Defendants admitted in their answer execution of the note; that no part of it had been paid; and that the note, by its terms, was purportedly due and payable. Defendants alleged failure of consideration. Without going into the details of defendants' answer at this point, suffice it to say that defendants claimed the note was for the purpose of evidencing the indebtedness that would be due plaintiff if and when plaintiff secured a purchaser ready, willing, and able to buy the property on the sellers' terms; that there was no sale; that plaintiff knew that defendants could not comply with the terms of the sales contract because the time needed to clear the

title and be in a position to deliver a free and clear title was longer than thirty days, which defendants claim the contract limited them to; and that plaintiff was negligent in procuring and submitting a sales contract, the terms of which plaintiff knew or should have known defendants could not satisfy in the time allotted.

Defendants filed a cross-petition seeking the equitable relief of cancellation, alleging mutual mistake of fact in that there was a title defect which neither plaintiff nor defendants knew could not be cleared within thirty days of the sales contract.

Defendants also counterclaimed alleging plaintiff was negligent in preparing and submitting to defendants a sales contract knowing that a known defect in title could not be cleared in thirty days and prayed damages consisting of loss of profits and expenses in the sum of $32,500.

At the outset of the trial the court requested the parties to briefly state their positions in the case to the court, and the positions stated are helpful in understanding this case.

Plaintiff's position was that the suit was on a note; that a certain letter from plaintiff to defendant Simons dated April 11, 1968, set forth the terms of the agreement as to commission; that parol evidence was not admissible to vary the terms of the April 11 letter; and that parol evidence was not admissible to vary the terms of the January 10, 1968, listing contract.

The defendants stated they raised one distinct defense in the case. That defense is that under the January 10, 1968, listing contract no commission was to be paid to plaintiff unless he secured a purchaser and the sale was finally consummated by payment of cash and delivery of mortgage notes as provided in the contract of sale; and that the commission agreement was evidenced partly in writing in the listing agreement of January 10, 1968, and partly in negotiations, written and oral, after that date between plaintiff and Simons. De-

fendants' attorney further stated, "that the letter of April 11, 1968, in which plaintiff transmitted the note in suit to be executed by the defendants specifically stated that it was in lieu of the previous·agreement and was understood to apply to the method of payment, not as modifying the agreement between the parties as to an actual liability for the commission." Defendants' attorney stated that if plaintiff contended the note plus the April 11, 1968, letter was intended as a new contract to supersede the listing contract then there was no new consideration for it and it was therefore void.

Defendants stated their second defense to be that, irrespective of the question of whether the commission was payable at the time of the acceptance of the sales contract by the defendants or only upon the sale being closed, the plaintiff knew at the time he submitted the sales contract to defendants that there was a title defect (Orecklin Trust interests hereafter noted) which would ordinarily require over thirty days to correct; that he did not advise defendants thereof; and that the defect was not irremedial but was 'one which required a lawsuit to remedy. In short, defendants claimed plaintiff submitted a sales contract to them which plaintiff knew, but defendants did not know, could not be satisfied within the time allotted.

The listing contract by which plaintiff was employed as defendants' broker was dated January 10, 1968. It provided that five apartment buildings and one vacant lot on Troost Avenue in Kansas City, Missouri, would be sold at auction by plaintiff and specified the terms of an acceptable auction sale. In the event the highest bid was less than $150,000 total, the defendants had the right to void the sale by paying to the highest bidder $100 within forty-eight hours of the auction.

Pertinent provisions of that listing contract are as follows:

"The undersigned owner warrants good and sufficient title to the subject property, and agrees to convey title to the purchaser, free and clear of all encumbrances, except any recorded restrictions, easements, community contracts and the sellers agree to offer the following terms to the high bidders; all cash, or 29% down payment, and agree to carry First Deed of Trust (Mortgage) for a period of 10 years at 6¾% of interest per annum."

"I agree to pay you a commission of 6 per cent of the gross selling price, or $1,200, whichever is greater, payable at the closing of sale, on each property sold."

"Should the subject property, or any portion thereof, be withdrawn from sale, leased, sold, or exchanged by anyone, including the owner, prior to auction, I will nevertheless pay you 6 per cent of the minimum selling price, stated above, as your fee."

"If the subject property is leased, sold, or exchanged to anyone in attendance at said auction, or to a party elicited, or secured through your efforts or advertising, then in such event I agree to pay you the above specified commission."

"You are hereby authorized to order a preliminary title opinion covering the subject property at my expense from Kansas City Title Company."

The Kansas City Title Company gave a preliminary title opinion on January 25, 1968, which stated, inter alia, "Title to an undivided ⅛ interest is held by Bessie G. Orecklin and Milton H. Goldrath as trustees under the last will and testament of Leo Orecklin which was admitted to probate in connection with ancillary administration on his decedent estate as Estate No. 94689 in the probate court of Jackson County, Missouri, at Kansas City." In order for Kansas City Title to issue a policy of title insurance insuring a free and clear title to any purchaser, the title company stated its requirement, among others, to be: "Proof must be furnished that Bessie G. Orecklin, the decedent's widow, and his

children, James Robert Orecklin and Carl Warren Orecklin, are alive at the time of the transfer to the prospective purchaser and that the trust is subsisting when the conveyance is made. The trustees' deed must recite the full consideration received and contain apt references to the trust powers under the will of said Leo Orecklin."

A copy of the preliminary title opinion of January 25, 1968, was forwarded to defendant Simons by plaintiff. Defendant Bessie G. Orecklin owned an undivided ⅛ interest in her own right and she and Milton H. Goldrath held an undivided ⅛ interest as testamentary trustees under the will of Leo Orecklin (hereinafter referred to as the Orecklin Trust). Goldrath did not hold any interest in the properties in his individual capacity.

According to the testimony of defendant Simons, Sylvia Hart, an attorney in Detroit, Michigan, was to handle the matter of the deed conveying the Orecklin Trust interests in the properties. Simons knew Hart and they conversed about the matter. All of plaintiff's dealings with the defendants were through Simons.

An auction was held on February 14, 1968, but the property was not sold. Plaintiff continued to try and locate a buyer with defendants' approval. Early in March 1968, Mr. Ogren contacted plaintiff and made an offer of $140,000 gross of which $10,000 would be paid as down payment and the balance to be represented by a first mortgage note and deed of trust. The offer was less in total amount and down payment than the sums specified in the January 10, 1968, listing contract. The offer was reduced to writing in the form of a real estate sales contract and submitted by plaintiff to defendants through Simons on or about March 13, 1968. It appears that defendants objected to the comparatively small down payment and to certain security provisions of that contract. On March 26, 1968, plaintiff forwarded copies of a new contract to Simons. The

amounts of the purchase price and down payment were the same but certain changes were made in the collateral security provisions, and it contained a provision that it had to be accepted by defendants on or before April 2, 1968. The time for acceptance was subsequently changed to April 22, 1968.

On April 2, 1968, one Estel E. Jenkins, counsel for Kansas City Title, wrote a letter to Sylvia Hart, with a copy to defendant Simons, which principally concerned the Orecklin Trust interests in the properties. The pertinent parts of the letter are as follows:

"We are concurrently herewith issuing new title reports under the above application numbers reflecting a change in our opinion as respects the trusteeship created by the will of Leo Orecklin, deceased. In our previous reports we reported title to the undivided ⅛ interest devised by the will of said decedent to be vested in Bessie G. Orecklin and Milton H. Goldrath as co-trustees of the trust estate. The will named Bessie G. Orecklin and James Robert Orecklin as co-trustees but provided that if James Robert Orecklin had not attained the age of 25 years his place would be filled by Louis Koretz and if he was unwilling to accept the trust or was disqualified, then it was to be filled by Harry Weinbaum until he attained that age. Based upon an order of the probate court of Wayne County, Michigan, reciting that James Robert Orecklin had not attained the age of 25 years and that Louis Koretz had declined to accept the trust and appointing Milton H. Goldrath as successor trustee, the probate court of Jackson County, Missouri decreed title to the subject property to be vested in Bessie G. Orecklin and Milton H. Goldrath as co-trustees. And we so reported the title. We now believe this to be in error for the reason that a testamentary trustee under Missouri law takes title to the trust estate by virtue of the will naming him and the order of any court purport-

ing to appoint him as such is unnecessary and void. Under these circumstances if James Robert Orecklin was not 25 years of age his place would be filled by Louis Koretz by force of the will naming him as successor trustee. If he declined to serve as he apparently did, then Harry Weinbaum took the position of successor trustee. The order of the probate court of Wayne County, Michigan makes no mention of Harry Weinbaum. If he declined to serve, then his place as successor trustee would have to be filled by the Circuit Court of Jackson County, Missouri as respects Missouri land, since no court of another state can appoint a trustee of Missouri land. See the case of De Lashmutt v. Teeter, [261 Mo. 412], 169 S.W. 34, 38, 39. In any event, if James Robert Orecklin has now attained the age of 25 years he is entitled to serve as co-trustee with Bessie G. Orecklin perforce of the will of Leo Orecklin, deceased. WE have no idea whether he has attained the age of 25 years. Also, if he has attained that age, he was, under the will, entitled to an absolute share in the corpus of the estate and we will require a quit claim from him and his spouse, if any, in addition to a trustee's deed executed by the proper parties."

"The deed or deeds by which the trustees convey title to the interest vested in them will have to be drafted as I know of no form for this purpose. It will have to recite the actual consideration. It will have to refer in apt and appropriate terms to the power granted in the will to sell to indicate that it is made pursuant to such power. As soon as we know who are the present trustees, the sale price, whether the whole tract will be conveyed or the separate parcels described in the title reports and the identity of the grantee, I may be of assistance to you in drafting the deed."

On April 8, 1968, plaintiff received three copies of the new preliminary title reports (hereinafter referred to as the April 2 title reports). The principal changes from the January 25 report concerned the Title Company's requirement regarding transfer of the Orecklin Trust interests as a prerequisite to the issuance of a title insurance policy to a purchaser. The April 2 title reports generally tracked the January 25 title report and in part stated: "If James Robert Orecklin has not attained the age of 25 years, or having attained that age, has declined to accept the trust, then the trust estate, under Missouri law insofar as it affects the land in question, must be deemed to be vested in the successor trustees named in the will in the order mentioned unless they in turn have refused to accept the trust or are otherwise disqualified. If none of the successor co-trustees named in the will are qualified to join Bessie G. Orecklin in the execution of the trustees' deed, then an action will have to be instituted in the circuit court of Jackson County, Missouri to appoint a successor co-trustee and construe the will with respect to the devolution of the power to sell upon such trustee. The reason for the appointment of the trustee by the Missouri court is that under Missouri judicial decisions a court of another state cannot appoint a trustee of Missouri land, and, therefore, our showing title to be vested in Milton H. Goldrath as one of the co-trustees is for convenience only."

Plaintiff testified he phoned Simons on April 8, 1968, immediately after receiving the April 2 title reports and told Simons he had the new title reports and the Orecklin Trust exception "was a lot bigger"; that he started to read the April 2 reports to Simons and, after getting through one or two paragraphs, Simons said, "Don't worry about it, it will be taken care of"; and that immediately after this phone conversation plaintiff mailed Simons a copy of the April 2 reports. Simons admitted having had the phone conversation with plaintiff but denied discussing the April 2 title reports and did not remember whether or not they discussed the Orecklin Trust matter. Simons denied ever receiving the April 2

title reports from plaintiff. Simons admitted to having received a copy of the April 2 letter of Estel Jenkins prior to the April 8 conversation with plaintiff and acknowledged that the April 2 letter from Estel Jenkins of Kansas City Title made reference to the possibility of having to file suit in the circuit court in order to pass good title to the Orecklin Trust interests.

On April 11, 1968, plaintiff phoned Simons and they conversed with regard to the broker's commission. Following the phone conversation and on that same day plaintiff wrote the following letter to Simons:

"This is to inform you of our agreement to alter the customary payment of commission on the sale of the above captioned property. In lieu of the full commission of $8,400 being paid in cash at the time of closing, we will waive any immediate payment and accept twelve equal monthly payments of $700 each, commencing thirty days from your acceptance of the contract on the above mentioned property.

"We are enclosing a personal unsecured note for execution by the members of your group. Please have them execute the same and return it in the enclosed self-addressed envelope.

"Concerning the occurrences that have taken place here in Kansas City in the past forty-eight hours, I strongly recommend acceptance at the very earliest possible moment."

The real estate sales contract containing the Ogrens' offer had been in the hands of Simons since about March 26, 1968. Simons acknowledged receiving the April 11 letter and the enclosed note.

Defendants offered to prove that thereafter defendant Simons spoke with plaintiff and objected to the way the note was drawn up; that plaintiff told Simons he wanted it drawn that way so he could negotiate the note at the bank; and that he wouldn't negotiate the note until the sale

of the properties was finally closed. Plaintiff objected to this evidence as a violation of the parol evidence rule in that the offered evidence was an attempt to vary the terms of the parties' written agreement —the letter of April 11, 1968. The objection was sustained.

Upon receipt of the April 11 letter from plaintiff, Simons then had for acceptance by defendants, or possible modification, the sales contract with the Ogrens and the promissory note to plaintiff. Simons testified that thereafter he had another phone conversation with plaintiff concerning the first paragraph of the April 11 letter; but defendants' offer of proof as to the content of that conversation was rejected on the grounds that the proferred oral testimony would be violative of the parol evidence rule. Defendants' offer of proof was as follows:

"I offer to prove by this witness that in that conversation Mr. Simons stated to Mr. Duggins that he hesitated to have such a note signed because it was payable immediately after or within a short time after the signing of the contract and that the commission would not be payable until the deal was closed. That Mr. Duggins stated to him—Mr. Simons stated to Mr. Duggins that in view of that fact, he wanted to change the terms of the note so as to provide that the commission would be payable only after the consummation of the sale, final consummation of the sale and Mr. Duggins replied to that that he intended to negotiate that note at a bank to secure money and if such provision was put in the note it would destroy it's negotiability and he therefore requested Mr. Simons to have the note signed as it was, telling Mr. Simons he would not negotiate the note until the sale was actually closed."

On April 19, 1968, the defendants executed the real estate sales contract with the Ogrens and also the promissory note although the note is dated April 23, 1968. Simons mailed the signed real estate sales contract and promissory note to plaintiff

and, on April 22, plaintiff delivered the executed sales contract and the April 2 title reports to the Ogrens.

Also, on April 22, 1968, plaintiff at the request of Simons sent a copy of the April 19 sales contract and copies of the April 2 title reports to Mr. Gough, attorney for defendants in Kansas City, Missouri. Simons had previously corresponded directly with the Kansas City Title Company with respect to the conveyancing of the Orecklin Trust interests as well as other matters relating to the title. Under date of April 25, 1968, Simons wrote to plaintiff stating that title to the property was in the process of being cleared up but it would take two to three weeks and that he had instructed attorney Gough "not to do any work until we have straightened out title."

Under date of May 17, 1968, the Ogrens, through their attorneys, wrote to plaintiff and all defendants and declared the sales contract of April 19 void for defendants' failure to comply with paragraphs 9 and 10 thereof in that the Ogrens had not received an up-to-date abstract or a commitment for a title policy.

Paragraphs 9 and 10 of the sales contract of April 19 are the same as appear in a proposed contract of March 13 containing an earlier offer by the Ogrens to purchase the property and are as follows:

"9. The seller shall, within twenty (20) days from the date hereof, deliver to the buyer or at the office of Duggins & Goodman, Inc. an abstract of title by competent abstractors showing all instruments of record affecting said property from the United States Government to this date, with the usual certificates as to bankruptcy, taxes, judgments and mechanics' liens. Subsequent acceptance of the abstract by the buyer shall be a waiver of time of delivery. The buyer shall have ten (10) days after such delivery of abstract to examine it. If there are objections to the title, the buyer shall specify the objections in writing, to be delivered to the office of Duggins & Goodman, Inc. The seller shall have any defects in the title corrected and shown on the abstract within thirty (30) days from date of delivery of such objections. The abstract shall become the property of the buyer.

"10. ~~In lieu of furnishing such abstract of title, or in lieu of correcting such objections,~~ [T]he seller shall ~~may~~ furnish the buyer an Owner's Title Insurance Policy in the amount of the purchase price from a company authorized to insure titles in this state, insuring a merchantable fee simple title in the buyer as of the date of recording the deed. The seller may, within twenty (20) days from the date hereof or the date of receipt of objections to said title, deliver to the buyer or at the office of Duggins & Goodman, Inc. any corrections in the title required by said company. In case such defects in title are not rectified within the time specified, or the title insurance commitment is not delivered, this contract shall be null and void, unless the buyer elects to waive such objections, and the money deposited aforesaid shall be returned to the buyer and the abstract returned to the seller."

The sale was not consummated and defendants did not pay plaintiff the real estate commission allegedly due and represented by the note sued upon.

■ Although this suit was brought on a promissory note, negotiable in form, plaintiff is the payee thereon and is not a holder in due course. The defendants have available all defenses which would be available in an action on a simple contract including failure of consideration. Sec. 400.3–306, RSMo 1969, V.A.M.S. When signatures are admitted, production of the instrument entitles a holder to recover on it unless the defendant establishes a defense. Sec. 400.3–307, RSMo 1969, V.A.M.S.

In this case defendants' signatures on the note are admitted and therefore plaintiff is entitled to recover unless defendants establish a defense.

Defendants' first four points are:

"I. The trial court erred in excluding evidence offered by defendant to show: (1) the terms of the original listing contract, consisting of Def. Exs. A, B, F, I, J and M; (2) that such terms were not thereafter changed, consisting of the excluded testimony of defendant Simons as to conversations with plaintiff and Def. Ex. O, and the court's refusal to allow plaintiff to be cross-examined on that subject; and (3) the conduct of the parties thereafter, in trying to make a new sale to Ogren or other parties, consisting of refusal to allow plaintiff to be cross-examined on that subject and refusal to allow Simons to testify thereon.

"(a) If there was any ambiguity in the original listing contract as to when a commission was to be earned, parol and written evidence of the prior negotiations and as to the conduct of the parties—showing their interpretation of the contract—was admissible to show the real intent of the parties.

"(b) Whether viewed as ambiguous or not, the listing contract—in view of the previous negotiations and the subsequent conduct of the parties—definitely made the actual closing of the sale a condition precedent to the earning of a commission.

"(c) There was no pleading of a modification of the original listing contract, so as to make the commission earned immediately on the signing of the preliminary sales contract.

"(d) Under the evidence, there was no modification of the original listing contract, so that a commission became due upon the mere signing of the preliminary sale contract, much less was there a completely 'integrated' contract under the 'parol evidence' rule.

"(e) The trial court erred in refusing to allow Simons to testify as to his conversation with plaintiff on this subject; in refusing to admit Def. Ex. O, a written memorandum of such conversation; and in refusing to allow the cross-examination of plaintiff on such conversation.

"II. Plaintiff's knowledge of the title defect prevents his recovery of a commission on a sale which failed because of such title defect.

"III. The trial court erred in refusing to direct a verdict for the defendants for the reasons that the evidence showed that the sole consideration for the note was the commission plaintiff was to earn upon making a sale of the property; that his contract for such a commission was dependent upon a final completion of the sale and that the sale failed because the buyer refused to accept the allegedly defective title and that plaintiff at the time of submission of such contract to defendants knew of such alleged defect in title.

"(a) Defendants could show as a defense to the note the failure of consummation of the real estate transaction.

"(b) There being no disputed issues of fact, the court should direct a verdict in favor of defendants, even though they have the burden of proof on this issue.

"IV. The court erred in refusing to give defendants' offered Instructions Nos. A, B and C submitting the issues of the commission being contingent on a consummation of the sale and of plaintiff's knowledge of a defect in title."

These points basically raise three questions: (1) Did the January 10, 1968, listing contract and the April 11, 1968, letter condition the real estate broker's commission on the consummation of the conveyance of title to the property sold under the April 19, 1968, real estate sales contract to the Ogrens? (2) Was there an ambiguity in the written agreements with respect to whether or not an actual conveyance was necessary before the defendants could become liable for the commission? (3) Was plaintiff real estate broker chargeable with advance knowledge that a lawsuit would be

necessary to convey the Orecklin Trust interests and that such would take over thirty days to complete?

It is recognized that a property owner employs a real estate broker for the singular objective of selling his property. But the listing contract imposes certain obligations upon the owners. The owners warrant *to the broker* that the owner has good title and agrees *with the broker* to deliver that title to a purchaser free and clear of all encumbrances—agrees to deliver a merchantable title. The listing contract itself permitted the owners to void an auction sale only if the offer at the auction was less then the bid required by the listing contract. By the terms of the listing contract, the owners were liable for the six percent commission even if there was no sale, if the property was withdrawn from sale, leased, sold, or exchanged by anyone, including the owner, prior to auction.

Plaintiff was given the exclusive right *to sell the properties for a period of sixty days following an unproductive auction.* The real estate sales contract that was accepted by defendants had been in possession of defendants since about March 26, 1968, well within the sixty days following the auction of February 14, 1968. This contract was accepted by all defendants on April 19, 1968, including the trustees of the Orecklin Trust—Milton Goldrath and Bessie Orecklin. The next act to be done following the acceptance of the contract by defendants was for defendants to deliver to the buyer an abstract of title pursuant to paragraph 9 of the contract and a commitment for an Owner's Title Insurance Policy insuring a merchantable fee simple title, etc., in the buyer pursuant to paragraph 10.

Whether or not the April 2, 1968, preliminary title report constituted a commitment for a title policy sufficient to satisfy the initial requirement of paragraph 10 is not in issue as defendants by their pleadings allege that they were unable to comply with the title requirements of the contract.

Defendants claim their inability to deliver a merchantable title so as to provide Ogrens with a title insurance policy insuring merchantable title was due to the opinion of Kansas City Title Company which stated that the interest owned by the Orecklin Trust was not properly vested in the trustees due to an irregularity in the appointment of Milton H. Goldrath as cotrustee, and that such defect would have to be corrected by a suit in the circuit court of Jackson County for the proper appointment of a trustee, and that such could not be done within the thirty days allowed by the sales contract—which thirty days began April 19, 1968. Defendants claim plaintiff was notified by the April 2 title reports which he received on or about April 4, 1968, that such a suit would be necessary but failed to inform defendants, and defendants would not have signed the contract had they known such a suit would be necessary.

The fact that the Orecklin Trust owned an interest in the property which would have to be conveyed to any buyer was always known to defendants. Milton Goldrath was a party to the efforts to sell the properties from the beginning and his only interest was as a cotrustee for the Orecklin Trust. Simons communicated with Kansas City Title and Sylvia Hart, the attorney for the Orecklin Trust, about the matter before and after the sales contract was signed. Plaintiff also knew that Orecklin Trust had an interest in the properties. The Orecklin Trust interests was not a defect in defendants' title as the trustees for that trust were parties to the listing contract, the sales contract, and are defendants in this case. The difficulty lies in the manner by which the Orecklin Trust interests would be conveyed.

Simons received a copy of the April 2, 1968, title reports from Jenkins of Kansas City Title to the Orecklin Trust lawyer, Sylvia Hart. The possibility of a lawsuit being necessary in order to obtain the appointment of a trustee by a Missouri circuit court was set forth therein. Whether

or not such a suit would be necessary depended upon other factors—the knowledge of which would be known to Sylvia Hart, Simons, Bessie Orecklin, Milton Goldrath, and perhaps other owners; but there is no evidence that plaintiff knew or was ever called upon or relied upon to find out anything whatever about such items as the age of James Robert Orecklin, one of the trust beneficiaries, or any other of the factors set forth in the April 2 letter. Under all of the evidence in this case, the entire matter of the manner of conveying the Orecklin Trust interests was in the hands of Simons and Sylvia Hart. The April 2 title reports added little or nothing of substance to the April 2 letter of Estel Jenkins insofar as the Orecklin Trust matter is concerned, but merely repeated that information.

Plaintiff testified he told or attempted to tell Simons about the provisions of the April 2 title reports regarding the Orecklin Trust on April 8, 1968, but that Simons simply told him not to worry about it—it was being taken care of in Detroit. Although Simons denied the foregoing, it was up to the jury to decide that fact question.

On April 19, 1968, when the defendants signed the sales contract, Simons, as an owner and agent for the other owners, and Sylvia Hart, as attorney for the Orecklin Trust trustees, had the information contained in the April 2 letter from the Kansas City Title Company, and they were the people who had knowledge of the various factors which would determine whether or not the title requirements of the contract could be met.

Plaintiff denied he knew that a merchantable title could not be conveyed within thirty days of April 19, 1968.

Instruction No. 3 authorized a defendants' verdict if the jury found in effect that at the time plaintiff requested defendants to sign the sales contract that plaintiff knew or by the exercise of ordinary care should have known that defendants could

not deliver merchantable title within thirty days after signing the contract and that, by drawing such contract to provide for only thirty days to cure title defects, the plaintiff was negligent.

Thus, the fact question of plaintiff's knowledge and the propriety of his conduct was submitted to the jury, and the jury found for plaintiff as it was within their province to do.

In Shopen v. Bone, 328 F.2d 655 (8th Cir. 1964), the court had before it a claim by a Missouri real estate broker and auctioneer for a commission under a broker's contract where the broker auctioned the property off to a buyer but the owners could not deliver merchantable title because the purchase price was not sufficient to pay off existing liens. The court held the broker was entitled to a commission when the sale fell through due to the owners' inability to deliver a merchantable title.

The court there said, loc. cit. 658. "An employment contract for the sale of realty is to be construed from the intent to be gathered from the language within the four corners of the instrument, Spears v. Carter, 224 Mo.App. 726, 24 S.W.2d 717 (1930), . . .

"While Missouri recognizes the general principle entitling an agent or broker to his commission once he has produced a purchaser ready, willing and able to buy on the terms proposed by the vendor, such a right, by express stipulation, may be contingent to vesting upon the occurrence or performance of other conditions or duties set forth in the contract of employment. Tant v. Gee, 348 Mo. 633, 154 S.W.2d 745 (1941); Bowman v. Rahmoeller, 331 Mo. 868, 55 S.W.2d 453 (1932); Pratt v. Irwin, 189 S.W. 398 (Mo.App.1916)."

After setting forth examples of express contingencies, the court in *Shopen* then said 328 F.2d at 658–659:

"In these instances the conditions preceding vesting of the broker's right to a

commission failed to materialize due to either the reluctance of the purchaser to perform or the fault of the broker himself. However, we have found no authority for the proposition that even should we hold under the contract that claimant's fee was contingent upon consummation of the sale, his right to compensation for services performed may be defeated by his employer's own inability to tender a merchantable title. To the contrary, cases abound which hold that the broker has earned his commission where consummation of the sale is prevented by default of the vendor. Prugh v. Tyrrell, 209 Mo.App. 582, 235 S.W. 143 (1921); Smith v. Stubb, 293 S.W. 496 (Mo.App.1927); Maddux v. St. Louis Union Trust Co., 186 Mo.App. 138, 171 S.W. 669 (1914); Vining v. Mo-La Oil Co., 312 Mo. 30, 278 S.W. 747 (1925); Knisely v. Leathe, 256 Mo. 341, 166 S.W. 257 (1914); Perrin v. Kimberlin, 110 Mo.App. 661, 85 S.W. 630 (1905); Keeney-Toelle Real Estate Co. v. Hillinghorst, 319 S.W.2d 675 (Mo.App.1959).

"It would be grossly incongruous for the parties to have agreed, as they did in one paragraph of the contract, that the vendors bear the burden of tendering a merchantable title and then intend in another provision indicating the broker was authorized to close the sale that the latter provision operated to cancel his right to a commission for services performed upon his employers' breach of the former provision due to a defect in their title. The inconsonance of these results is apparent, for such an interpretation of the employment contract would destroy the parties' mutuality of obligation. The broker, once he had performed, would have no assurance of performance on the part of his employer who could preclude completion of the sale by arbitrarily creating a cloud on his title and thereby eliminate his obligation to pay the broker his fee. If the vendor wants this protection from payment of the broker's commission in the event his title proves defective and frustrates a completed sale of the property, he must specifically so provide in their contract of employment. See Prugh v. Tyrrell, supra; Gerhart v. Peck, 42 Mo.App. 644 (1890). If the vendors here had desired such protection, it is a reasonable assumption that it would have been clearly specified in the employment contract they executed in the office of their attorney."

In the instant case, plaintiff produced a buyer who was ready, willing, and able to buy on the terms agreeable to the defendants-vendors. The defendants knew the Orecklin Trust interests had to be conveyed in order to pass merchantable title and the duty of handling that matter, as between defendants and plaintiff, was the primary responsibility of Sylvia Hart, attorney for the Orecklin Trust interests, and Leonard Simons, owner, lawyer, and representative of all defendants in their dealings with plaintiff. The evidence viewed in the light most favorable to the verdict is that Simons told plaintiff not to be concerned about the Orecklin Trust interests, that it was being taken care of in Detroit. Simons and Sylvia Hart had the April 2 letter from Kansas City Title's counsel, Estel Jenkins, which letter sets forth that if certain contingencies existed a deed would suffice to pass the Orecklin Trust interests, but that if those contingencies did not exist a suit would be necessary to appoint a trustee. No one looked to plaintiff to determine whether or not a suit would be necessary, but rather that matter was being handled in Detroit by Simons and Sylvia Hart for the defendants. The contingencies expressed in the letter are matters which defendant Bessie Orecklin, her attorney Sylvia Hart, and Mr. Simons, would be expected to know about but which plaintiff would know nothing about. Questions such as whether or not James Robert Orecklin had reached the age of twenty-five, and other matters relating to the Orecklin Trust, would not be known to plaintiff but would be known to defendants.

The court holds that the passage of title from defendants to the Ogrens, consumma-

tion of the sales contract, was not a condition expressed in the listing contract of January 10, 1968, necessary to the vesting of plaintiff's right to a commission where, as here, the failure to consummate the sale was not due to default by the purchaser nor to any act or neglect of the broker but due solely to the inability of the defendants to tender merchantable title and where, as here, the owners, principals, gave assurances to the broker that the "defect" was being taken care of and not to worry about it.

There is no ambiguity in the January 10, 1968, listing contract, the April 11, 1968, letter, nor the note sued upon, so as to permit oral testimony to explain the terms of the contract. Defendants argue that under the January 10 listing contract a consummation of a sale was a necessary prerequisite to liability for a commission. Their position seems to be that had the auction produced a buyer who was ready, willing, and able to purchase on defendants' auction terms, but the consummation of the sale was frustrated by defendants' inability to deliver a merchantable title by reason of a defect unknown to the broker, defendants would not be liable for a broker's commission. That, of course, is the *Shopen* case, and liability for the commission would be present under those circumstances unless the broker was estopped to claim his fee by reason of advance knowledge of title defects which caused the sale to fail.

As stated in Shopen, *supra*, loc. cit. 328 F.2d 600: "This established precedent is bottomed upon sound reasoning. The broker takes the contract to procure a purchaser ready, willing and able to buy what the broker's principal has to sell. If the broker knows that the principal has a title which the purchaser will not accept, then he has not produced a purchaser in accordance with the terms of his agreement.

"Here, actual, not constructive, notice is required for estoppel to apply, and ordinarily, it is not incumbent upon the broker to inquire as to the existence of any defects."

The April 11 letter from plaintiff to defendants is perfectly clear and unambiguous in its terms. The first installment on the note is, by the terms of the title, payable thirty days after the April 19 contract is accepted by the defendants. That contract was accepted April 19, 1968. The offer of proof was that there was an oral understanding that no commission would be paid unless a sale was finally consummated. This evidence is not in explanation of either the January 10 listing contract or the April 11 letter and subsequent note, for it simply contradicts the terms of those documents rather than explaining them and therefore is not admissible under the parol evidence rule. For this same reason the court did not err in sustaining plaintiff's objections to defendants' exhibit O.

In Toney v. Lambarth, 514 S.W.2d 106 (Mo.App.1974), the court was concerned with the consideration of extrinsic evidence offered to aid in the construction or interpretation of a written contract. The court of appeals, quoting from Willman v. Beheler, 499 S.W.2d 770 (Mo.1973), said at 108: "If the terms of a contract are clear and unambiguous the contract will be enforced or given effect in accordance with its terms, and without resort to construction to determine the intention of the parties. (citation omitted) In such case the construction of the parties, if at variance with the written terms, will not be followed, (citation omitted) but the contract will be construed as written. (citation omitted) 'When the language of a contract is plain, there can be no construction because there is nothing to construe.'"

In the instant case, the terms of the January 10 listing contract, the April 11 letter, and the note are clear and unambiguous. The court did not err in refusing to allow oral testimony to show an understanding that a completed sale was, in all events, a prerequisite to liability for the broker's commission.

In *Shopen* the court held the record was devoid of any evidence that the broker had any knowledge of a second deed of trust causing a defect in vendor's title.

In the instant case, all of the parties knew the Orecklin Trust had an ownership interest in the properties from the outset and that that interest would have to be conveyed to a purchaser. Whether that interest could be conveyed by certain deeds or whether a Missouri suit to name a trustee would be required depended upon the contingencies expressed to the attorney for the Trust and defendant Simons in the letter of April 2, 1968, from Kansas City Title Company. As previously noted as to those contingencies, the correct state of facts would be known by those persons having personal knowledge of the Orecklin Trust and its beneficiaries, and those persons were the defendants and Sylvia Hart, attoney for defendant Bessie Orecklin and the Orecklin Trust. And, as indicated, as to that matter, defendants, through Simons, told their agent, plaintiff, not to be concerned about it, it would be taken care of.

The court holds that plaintiff had a right to rely upon these representations by his principals, particularly where one of the principals was a lawyer. Simons was admittedly knowledgeable in real estate matters and familiar with the personages involved in the Orecklin Trust. There is no evidence that plaintiff knew or should have known that the Orecklin Trust would not be able to convey title by deed without suit or that suit would be necessary or that suit on this type of matter would require more than thirty days. But defendants say plaintiff should have known it would take more than the thirty days allowed in the April 19 sales contract to process a suit for the appointment of a trustee and, therefore, plaintiff should not have submitted a contract with such a short-time provision in it.

At best, that was a jury issue and the jury on that issue found against defendants. It is not this court's function to weigh the evidence, but there was evidentiary support for the jury's determination of this question in favor of plaintiff. The point is overruled. For the reasons given supra, defendants' contention that the court erred in refusing to given instructions A, B, and C, submitting the issue of a commission being contingent on a consummation of the sale and of plaintiff's knowledge of a defect in title is overruled.

■ Defendants' fifth point is: "The court erred in refusing the evidence offered by defendants to show that they filed suit to correct the defect in title and prosecuted such suit to judgment at the earliest possible time."

The proffered evidence referred to in the above point consists of the petition for the appointment of a substitute cotrustee for a testamentary trust filed July 10, 1968, in the circuit court of Jackson County, Missouri; summonses issued thereon; entries of appearance and answers, and the decree dated September 19, 1968, appointing Milton H. Goldrath cotrustee of the Orecklin Trust estate.

As indicated, his suit was filed July 10, 1968. Ogrens declared the sales contract void May 17, 1968. On May 23, 1968, Mr. Simons notified defendants' attorney Raleigh Gough that the owners did not want to go to a lot of expense to try and hold the Ogrens to the contract and that everything should be held in abeyance until Mr. Simons returned to Detroit on June 2, 1968. Defendants' attorney Gough offered the suit papers in evidence to show that *he* moved as expeditiously as possible on the matter. Mr. Gough's conduct is not an issue in this case. Furthermore, it is apparent that the Orecklin trustees wanted to sell the properties, and they believed, on the basis of the Kansas City Title Company's opinions and advice of attorneys, that it was necessary to have a trustee designated by a Missouri court in order for the trustees to convey good title to the Orecklin Trust interests whenever the opportunity to sell occurred in the future. Defendants have not shown

how this evidence bore upon the issues in the case. The court did not err in excluding such evidence. The point is overruled.

Defendants' point VI is: "The court erred in allowing plaintiff to cross-examine Simons on the fact that defendants owned other properties and in refusing to discharge the jury when counsel asked if the defendants were not 'millionaires'." Mr. Simons, over objection, answered the question as to whether this group of defendants was interested in other properties in the negative, and there is no mention of the trial court's ruling on that question in defendants' motion for new trial.

The record reflects the following with respect to the second question:

"Q  Did you not tell Mr. Duggins April 11, 1968, members of this group, several of them were millionaires, he didn't need to worry about it?

MR. W. RALEIGH GOUGH: I object to that. It's highly inflammatory.

THE COURT: Sustained.

MR. W. RALEIGH GOUGH: It's a mere attempt to inject prejudice in this case and I ask the jury be discharged.

THE COURT: The motion for discharge is overruled and the jury is instructed to disregard the last question."

As noted, the question was not answered and no further reference was made to the matter. The trial court did not abuse its discretion in denying the motion for mistrial. The point is overruled.

Point VII is: "The court should grant equitable relief by way of cancellation under defendants' cross-petition, on account of the mutual mistake on the state of the title."

Under this point defendants contend that obviously "a mistake occurred somewhere along the line, for it cannot be thought that the defendants, following the lead of Mr. Simons, a lawyer, would have entered into a contract giving only 30 days for the correction of title defects of such magnitude as that mentioned in the practically two pages of the requirements as to the Orecklin Trust Estate in the April title reports." Defendants argue that plaintiff was probably mistaken also "because it would not readily be believed that he would draw up a contract for sale—from which he expected a substantial commission—and so draw it up that the purchaser could at any time back out of the contract if he cared so to do, by reason of such title defect. Plaintiff had notice and actual knowledge of the title company's requirements in this respect, although—not being a lawyer—he might not have appreciated the full legal effect of those requirements." Defendants argue that both plaintiff and defendants "had the mistaken idea that there was no title defect which could not be remedied within the 30 days set by the Ogren contract."

Defendants cite Shanklin v. Ward, 291 Mo. 1, 236 S.W. 64 (1921); Cooper County Bank v. Bank of Bunceton, 221 Mo.App. 814, 288 S.W. 95 (1926); Moore v. City of Beaumont, 195 S.W.2d 968 (Tex.Civ.App. 1946); Pierce v. Pois, 15 S.W.2d 1072 (Tex.Civ.App.1929); Eisenbeis v. Shillington, 349 Mo. 108, 159 S.W.2d 641 (1941), and Frederich v. Union Electric L. & P. Co., 336 Mo. 1038, 82 S.W. 79 (1935); for the proposition that equitable relief of rescission can be granted where there has been a mutual mistake of material fact between the contracting parties, but none of the cases cited are analogous to the case at hand. None of the cited cases involve a situation where the sales contract was not consummated due to the default of the broker's principal—the seller.

It must be remembered that by the provisions of the listing contract the defendant-owners promised plaintiff-broker they would deliver a merchantable title to a purchaser and thereafter, under the evi-

dence, Mr. Simons assured plaintiff that the conveyance of the Orecklin Trust interest was being taken care of in Detroit and for plaintiff not to worry about it. The contract that was accepted by defendants on April 19, 1968, was secured by plaintiff from the Ogrens and forwarded to Simons on or about March 26, 1968, which was prior to the April 2 letter and title reports from Kansas City Title, and all plaintiff did was to call the Orecklin matter to the attention of Mr. Simons. Leonard Simons and Sylvia Hart, both attorneys, knew more about defendants' ability to deliver merchantable title than did plaintiff. All of the defendants signed the sales contract after the possibility of a suit being necessary to appoint a trustee was known to Simons, their spokesman, and Hart, the Orecklin Trust lawyer. Of course, plaintiff believed defendants could deliver merchantable title—they covenanted to do exactly that, and Mr. Simons, their spokesman, assured plaintiff there were no problems.

 If this is to be construed as a mutual mistake of fact warranting rescission, then everytime an owner finds he cannot deliver the title required by the sales contract, and which he promised to deliver, the owner could walk away from his listing contract with impunity. This is so because under Shopen v. Bone, *supra,* and the Missouri cases cited therein, the broker is estopped from claiming his fee *if he had actual advance knowledge* of a defect which would frustrate the sale prior to procuring the sales contract from the buyer, and under "mutual mistake of fact" if he *did not have such knowledge* but believed his principal could deliver good title.

This case is controlled by the principles enunciated in Shopen v. Bone, *supra,* under which the owner-principal is liable to his broker for the broker's commission where the broker has produced a buyer ready, willing, and able to purchase on the owner's terms but the consummation of the sales contract is frustrated by the seller's default in failing to deliver merchantable title when that inability was not known to the broker prior to the procurement of the signed sales contract. The point is overruled.

The judgment is affirmed.

DONNELLY, C. J., and HOLMAN, J., concur.

SEILER, J., not sitting.