**Dan BYRD, Appellant,**

v.

**FRANK B. WILSON TRUST, Respondent.**

**No. WD 64628.**

Missouri Court of Appeals, Western District.

Jan. 24, 2006.

John P. Ryan, Jr., Grandview, MO, for appellant.

Mark J. Bredemeier, Lee's Summit, MO, for respondent.

Before HARDWICK, P.J., BRECKENRIDGE and SPINDEN, JJ.

PATRICIA BRECKENRIDGE, Judge.

Dan Byrd appeals the summary judgment in favor of the Frank B. Wilson Trust on his suit for breach of contract for failure to pay his commission for the sale of real estate owned by the Trust. In his sole point on appeal, Mr. Byrd claims the trial court erred in granting the Trust's motion for summary judgment because he fully performed his obligations under the contract and, therefore, was entitled to his commission. Because this court finds that Mr. Byrd produced a buyer ready, willing, and able to purchase the real estate on terms acceptable to the Trust, Mr. Byrd was entitled to his commission. Therefore, the trial court erred in granting the Trust's motion for summary judgment. Accordingly, the trial court's judgment is reversed, and this case is remanded to the trial court with directions to enter summary judgment in favor of Mr. Byrd.

## Factual and Procedural Background

Both parties filed motions for summary judgment, agreeing that there are no disputed facts. The undisputed facts are that Frank B. Wilson established the Trust prior to his death, on May 12, 2002. Jan Martinette and Marietta Boenker, Mr. Wilson's daughters, are co-trustees of the Trust. The Trustees decided to sell 18.8 acres of real estate, including Mr. Wilson's former residence, and the personal property in and around the residence. Ms. Martinette, as agent for the Trust, contacted Mr. Byrd, an individual in the business of auctioning personal and real property. Mr. Byrd operates his business under the name of Antler Ridge Auction Company. On October 6, 2002, Mr. Byrd and Ms. Martinette entered into two contracts for Mr. Byrd to sell the property by auction. One contract, titled "Personal Property Auction Contract," provided that Mr. Byrd was to sell the personal property by auction and receive a fifteen percent commission. The second contract, titled "Real Estate Auction Contract," provided that Mr. Byrd was to sell the real estate by auction and receive a four percent commission. Under both contracts, the Trust was responsible for paying the advertising costs of the auctions.

Mr. Byrd conducted an auction of the Trust's personal and real property on October 12, 2002. After the conclusion of the auction of the personal property, the Trust paid Mr. Byrd his commission in accordance with the terms of the personal property contract. At the auction of the real property, Dr. Daniel Downs' bid of $575,000 was the high bid. In accordance with the terms of the real estate contract between Mr. Byrd and the Trust, Dr. Downs wrote a check payable to the Trust

for ten percent of the bid, or $57,500. Dr. Downs gave the check to Ms. Martinette, as the agent of the Trust, who subsequently delivered the check to a title company. The Trust issued a receipt to Dr. Downs acknowledging that a down payment had been made and that the remainder of the $575,000 was due at closing.

On October 17, 2002, Mr. Wilson's residence was destroyed by a fire of unknown origin. The fire destroyed all but the foundation and I-beam of the house. As a result of the fire, Dr. Downs stopped payment on the check for $57,500 and refused to follow through with purchase of the property.[1] The Trust paid Mr. Byrd for the advertising costs associated with the real estate auction, but refused to pay him the four percent commission for sale of the real estate.

Mr. Byrd filed a petition for breach of contract against the Trust, claiming that he performed all of his duties under the contract and successfully sold the real estate and, therefore, was entitled to his commission. In its answer, the Trust asserted that because the real estate sale never closed, Mr. Byrd was not entitled to his commission. The Trust also raised, among other things, the affirmative defenses of impossibility of performance and commercial frustration. Both parties filed motions for summary judgment. Following oral arguments, the trial court denied Mr. Byrd's motion for summary judgment, sustained the Trust's motion for summary judgment, and dismissed with prejudice Mr. Byrd's petition.[2] The trial court also

ordered Mr. Byrd to pay court costs. Mr. Byrd appeals.

## Standard of Review

Appellate review of a summary judgment is *de novo*. *ITT Commercial Fin. Corp. v. Mid–Am. Marine Supply Corp.*, 854 S.W.2d 371, 376 (Mo. banc 1993). This court's criteria for ascertaining the propriety of summary judgment are the same as those that a trial court uses initially. *Id.* This court does not defer to the trial court's order granting summary judgment because the trial court's initial judgment is based on the record submitted and amounts to a decision on a question of law. *Id.* Summary judgment is appropriate where the moving party establishes that no genuine issue of material fact exists and the party has a right to judgment as a matter of law. *Id.* at 378.

For movants who are the defending parties in a lawsuit, the prima facie showing required by Rule 74.04 is "necessarily different." *Id.* at 381. A defending party may establish a right to judgment, as a matter of law, by showing:

> (1) facts that negate *any one* of the claimant's elements facts, (2) that the non-movant, after an adequate period of discovery, has not been able to produce, and will not be able to produce, evidence sufficient to allow the trier of fact to find the existence of *any one* of the claimant's elements, or (3) that there is no genuine dispute as to the existence of *each* of the facts necessary to support

1. The Trust eventually sold the property to another purchaser who was not a registered bidder at the October 12, 2002 auction.

2. Considering that the trial court ruled on the merits of the case and granted summary judgment in favor of the Trust, the court's order that Mr. Byrd's petition was dismissed with prejudice was contrary to the clear intent of

the judgment and has no effect. *Woodfill v. Shelter Mut. Ins. Co.*, 878 S.W.2d 101, 103 (Mo.App.1994) (intention of the court is determined from consideration of the judgment in its entirety). *See also generally Mark Twain Elec., Inc. v. Yalem*, 825 S.W.2d 366, 368 (Mo.App.1992) (comparison of procedure for dismissal to those for summary judgment).

the movant's properly-pleaded affirmative defense.

*Id.*

### Trust Not Entitled to Summary Judgment As a Matter of Law

In his sole point on appeal, Mr. Byrd claims the trial court erred in granting the Trust's motion for summary judgment because he fully performed under the terms of the contract. Specifically, Mr. Byrd claims that because he completed the auction and produced a ready, willing, and able buyer, he fully performed all of his obligations under the terms of the contract and, therefore, he was entitled to his commission. The Trust argues, in response, that the contract required a consummated sale to a bidder at the auction before Mr. Byrd earned his commission.

 Under Missouri law, the general rule is that "an agent or broker [is entitled] to his commission once he has produced a purchaser ready, willing and able to buy on the terms proposed by the vendor." *Shopen v. Bone,* 328 F.2d 655, 658 (8th Cir.1964).[3] In other words, "[t]he seller is liable for his broker's commission when a purchaser is willing to buy on the seller's terms or on terms agreeable to the seller." *Meridian Interests, Inc. v. J.A. Peterson Enters., Inc.,* 693 S.W.2d 179, 182 (Mo.App.1985).

 In this case, the contract provided that the auction of the real estate was to be held on October 12, 2002. Under the contract, the Trust reserved "the right to accept or reject the final bid," and the terms of the sale were specified as "10%

Down Remainder at Closing." On October 12, 2002, Mr. Byrd auctioned off the real estate as set forth in the real estate contract. At the auction, Dr. Downs made the winning bid to purchase the real estate for $575,000 and wrote a check to the Trust in the amount of $57,500, ten percent of his offer. The Trust accepted the down payment and issued a receipt to Dr. Downs, which indicated that the remainder was to be paid at closing. Once the Trust accepted Dr. Downs' check for the down payment, Mr. Byrd successfully discharged his duty under the contract by producing a buyer ready, willing, and able to purchase the real estate on terms agreeable to the Trust.

Nevertheless, the Trust argues that the contract entered into between Mr. Byrd and the Trust manifested an intention that Mr. Byrd's commission would not be earned until the sale of the real estate was fully consummated at a "closing." The Trust argues that because the real estate contract contains the word "sale" in numerous places, the general rule that a broker is entitled to his commission when he produces a ready, willing, and able buyer, "whether or not the sale is completed," is inapplicable in this case. In other words, the Trust argues that because the contract contemplated a "sale," which the Trust defines as a "closing," and because no closing occurred, Mr. Byrd was not entitled to his commission.

 The Trust correctly notes that the general rule, providing that a broker is entitled to his commission when he produces a buyer ready, willing, and able to purchase on terms agreeable to the seller,

---

3. The court in *Shopen* applied "the general principle entitling an agent or broker to his commission once he has produced a purchaser ready, willing and able to buy on the terms proposed by the vendor" to a contract for sale by an auctioneer, in recognition of the fact that the nature of an employment contract for the services of an auctioneer and an employment contract for the services of a broker are so similar that this principle applies equally to both situations. 328 F.2d at 658.

may be modified by the contract. In particular, the seller's liability to pay a broker his commission, "by express stipulation, may be contingent to vesting upon the occurrence or performance of other conditions or duties set forth in the contract of employment." *Duggins v. Simons,* 517 S.W.2d 82, 92 (Mo.1974). The Trust cites several provisions of the contract containing the word "sale" that it claims demonstrates the parties' intention to condition the Trust's liability on "closing" of the real estate "sale."

In particular, the Trust claims that the subtitle to the contract, "Agreement for *Sale* of Real Estate by Auction," conveys an intention to transfer or sell real estate. (Emphasis added). The Trust also argues that the phrases, "[t]he auctioneer hereby agrees to use his professional skill, knowledge, and experience to the best advantage of both parties in preparing for and conducting the *sale*" and "the [Trust] hereby releases [Mr. Byrd] from any liabilities that arise from the *sale* of said property," further demonstrate that the purpose of the contract was *to sell the real estate.* (Emphasis added). In addition, the Trust claims that the contract provision setting the "Terms of *sale*," under which was written, "10% Down Remainder at Closing," "manifests the purpose of the agreement being the *sale* of real estate, not the mere conducting of an auction on a given day."

 In interpreting a contract, "a court will seek to ascertain the intent of the parties and to give effect to that intent." *Triarch Indus., Inc. v. Crabtree,* 158 S.W.3d 772, 776 (Mo. banc 2005). "The intent of the parties to a contract is presumed to be expressed by the ordinary meaning of the contract's terms." *Id.* If a contract's language is not ambiguous, this court will enforce it as written. *Id.* "If ambiguous, it will be construed against the drafter...." *Id.*

Applying these rules of construction, none of the contract provisions cited by the Trust expressly provide when Mr. Byrd was to earn his commission. Moreover, this court disagrees with the Trust's argument that the real estate contract contemplated a real estate "closing." Rather, the language of the contract indicates that the parties contemplated that a "sale" occurred, i.e., Mr. Byrd "sold" the property, not at "closing" but, rather, at the point in time when Mr. Byrd found a buyer agreeable to the Trust.

Specifically, under the contract, the Trust reserved the "right to accept or reject the final bid," and "agree[d] that if [the] real estate [was] *not sold on day of auction,* but sells at a later date to a 10–12–02 registered bidder, then auctioneer is entitled to full commission." (Emphasis added). Thus, contrary to the Trust's argument, under the plain meaning of this contract provision, the parties contemplated that if Mr. Byrd found a buyer agreeable to the Trust, on the "day of auction," the real estate would be considered "sold." In agreeing that the property could be "sold" on the "day of auction," the parties manifested their intent that a "sale" occurred when Mr. Byrd found a buyer agreeable to the Trust, not at "closing," which would clearly occur at a point in time after the "day of auction." The language of the contract does not support the Trust's claim that the parties intended that a "closing" was a condition precedent to Mr. Byrd earning his commission.

This court reached a similar conclusion when determining whether a consummated sale was required by an agency contract in *Concannon v. Point Mining & Milling Co.,* 156 Mo.App. 79, 135 S.W. 988, 991 (1911). In that case, this court rejected the argument made by the defendant that the plaintiff was not entitled to his sales commission because "there was no sale in

fact" under the contract. In *Concannon,* the plaintiff was a barite salesman for the defendant company. *Id.* at 989. Under the terms of the agency contract between the plaintiff and the defendant, the plaintiff was entitled to a commission on all sales or shipments of barite made in a specified territory. *Id.* On December 15, 1906, the plaintiff brought together the president of the defendant company and representatives of interested purchasers, including the Hammer Paint Company. *Id.* During the course of negotiations, the parties agreed on the terms of a contract for the sale and shipment of barite for the upcoming year. *Id.* The details of the contract were eventually finalized in a written contract. *Id.* at 990. Eleven days after the written contract was signed by the purchaser, however, a change in market conditions prompted the defendant to refuse to sign the contract, repudiating the deal. *Id.* at 990–91. Consequently, no goods were ever shipped under the contract. *Id.* at 990. Nevertheless, the plaintiff alleged that he was entitled to his sales commission. After the defendant refused to pay the plaintiff his commission, the plaintiff sued claiming that, under the terms of his agency contract with the defendant, he had made a sale and, therefore, was entitled to his commission. *Id.* at 989. The defendant, however, argued that the plaintiff was not entitled to his commission because the term "sale" in the contract "means an actual sale, consummated by delivery, and not a mere sale in a commercial sense." *Id.* at 991.

This court disagreed with the defendant, however, finding that because the plaintiff had brought the defendant and a purchaser together, and the defendant and the purchaser had agreed upon the terms of the transaction, the plaintiff had done all that he was obligated to do under the terms of the contract and, therefore, the plaintiff was entitled to his commission. *Id.* In reaching this conclusion, this court set forth the following principle regarding contracts for the sale of real estate. In particular, this court stated:

> [A] real estate broker earns his commission when he finds and produces to the proposed seller one who is ready, able and willing to buy upon the terms upon which the broker is authorized to negotiate the sale, and in case the owner refuses to complete the transaction by delivery, *the law declares the sale complete as far as the broker is concerned.* His commissions are then due him. The performance of the contract upon his part was then complete and the sale consummated so far as the agent was concerned. He had done all that he had contracted to do and all that the law requires. It was not only out of his power to make delivery but he was under no obligation to do so: he could do no more than he had done. He earned his commission when he brought the parties together, and they had agreed to the sale and purchase.

*Id.* at 992 (emphasis added).

The facts of this case are that, on the day of the auction, Mr. Byrd produced a buyer who was ready, willing, and able to purchase the real estate on terms agreeable to the Trust. At this point in time, the sale was complete as far as Mr. Byrd was concerned. After completing the auction and finding an acceptable buyer, Mr. Byrd had done all that he had contracted to do. Similar to the salesman in *Concannon,* who was unable to control the market, Mr. Byrd did not have the power to deliver the property to Dr. Downs or to protect the property from a casualty loss. In the absence of an express contract provision to the contrary, Mr. Byrd was entitled to his commission when he produced a buyer ready, willing, and able to purchase the property on terms agreeable to the Trust. *See also Gwinnup v. Sibert,* 106 Mo.App. 709, 80 S.W. 589, 590 (1904) (finding that the defendant could not argue that

there was no sale because they refused to carry out their agreement to consummate the transaction when the plaintiff, a real estate broker, produced an able and willing buyer who paid a down payment). Mr. Byrd fulfilled his obligations under the terms of the real estate contract when the Trust agreed to Dr. Downs' offer and, therefore, Mr. Byrd was entitled to his commission.

 Nevertheless, the Trust further argues that the phrase "[t]he seller agrees that all expenses incurred for the advertisement, promotion, and of conducting said auction shall be first paid from the proceeds realized from said auction before the payment and satisfaction of any liens or encumbrances," evidences an understanding that Mr. Byrd's commission would be paid "from the proceeds realized from said auction." In other words, the Trust claims that because proceeds are not received from the sale of real property *until the sale is closed,* if the sale did not close, "the seller would have no proceeds with which to pay the auctioneer his significant commission." Thus, the Trust argues that it would never have agreed to pay a full commission on auctioned real estate that "failed to close." The fact that Mr. Byrd was to receive the expenses of the auction out of the proceeds before payment of liens and encumbrances does not indicate the parties' intent regarding when Mr. Byrd earned his commission. "[T]he mere fact the broker was to receive

his compensation out of the proceeds of the sale does not make his right to compensation dependent at all events on the completion of the sale." *Shopen,* 328 F.2d at 659. Viewed in the context of the other provisions in the contract, this court finds that the noted contract provision expresses no intent with regard to when Mr. Byrd earned his commission.[4]

In sum, under Missouri law, in the absence of an "express stipulation" in the contract indicating a contrary intent, a broker is entitled to his commission upon producing a buyer ready, willing, and able to purchase the real estate on terms agreeable to the seller. *Duggins,* 517 S.W.2d at 92. Here, the contract between the Trust and Mr. Byrd contains no express provision regarding when Mr. Byrd earned his commission. Because Mr. Byrd produced a buyer ready, willing, and able to purchase the real estate on terms agreeable to the Trust, he was entitled to his commission. Therefore, the trial court erred in granting summary judgment in favor of the Trust, rather than for Mr. Byrd. Accordingly, the trial court's judgment is reversed and the case is remanded to the trial court with directions to enter summary judgment in favor of Mr. Byrd.

All concur.

---

**4.** The Trust also argues that, even if the contract is interpreted so that Mr. Byrd earned his commission upon producing Dr. Downs, the affirmative defenses of impossibility of performance and commercial frustration bar his claim. Under Missouri law, however, "[t]he general rule is that a broker earns his commission when he produces a buyer ready, willing and able to buy on terms specified by the seller, *whether or not the sale is completed." Meridian,* 693 S.W.2d at 182 (emphasis added). Because the contract contains no express provision deviating from this general

rule, Mr. Byrd's duty under the contract was to produce a ready, willing, and able buyer. At the time Dr. Downs provided a check for the down payment to the Trust, Mr. Byrd produced such a buyer and, therefore, had done all he was obligated to do. In other words, the contract was complete as far as Mr. Byrd was concerned. Any possible defense regarding impossibility of performance or commercial frustration would arise in the context of the transaction between the Trust and Dr. Downs, not the Trust and Mr. Byrd.