Leo J. CHRISTESON and LJC Enterprises, Inc., a Missouri corporation, Respondents,

v.

Charles R. BURBA, Appellant.

No. 14570.

Missouri Court of Appeals, Southern District, Division Two.

July 21, 1986.

Rehearing Denied Aug. 11, 1986.

Michael L. McDorman, James Endicott, Versailles, for appellant.

Gene A. Hilton, Hilton & Bennett, Camdenton, for respondents.

CROW, Judge.

This appeal arises from a suit to cancel a promissory note and a deed of trust securing payment of the note.

The record furnished us consists of an intricate series of documents and a transcript of the somewhat enigmatic testimony of the only two persons who testified. The assignments of error are easier understood after a synopsis of the evidence.

On July 30, 1980, a certificate of incorporation was issued by the Secretary of State of Missouri to Fiber Unique Company, Inc. ("Fiber Unique"). The articles of incorporation identified the incorporators as Charles R. Burba ("Charles Burba"), James Dean Ridgway ("Ridgway"), and Dennis Frederick Lovett.

On September 9, 1980, the first meeting of the incorporators and shareholders of Fiber Unique was held. The minutes of that meeting show that two of the three incorporators, Charles Burba and Ridgway, attended. The minutes further show that three shareholders were present: Charles Burba, Ridgway, and Irvin Huske, Jr., ("Huske"). Although no stock certificates were produced at trial, Fiber Unique's records reflect that the ownership of shares was: Charles Burba, 275 shares; Ridgway, 175 shares; Huske, 50 shares. Among other business at the September 9, 1980, meeting, the shareholders elected four directors, the number authorized by the articles of incorporation. Elected were: Charles Burba, Ridgway, Huske, and Patricia J. Burba ("Patricia Burba").

The four directors met later the same day and elected the following officers: Ridgway, president; Huske, vice president; Patricia Burba, vice president; Charles Burba, secretary-treasurer.

So far as Fiber Unique's corporate records show, the shareholders, directors, and officers of Fiber Unique remained unchanged until the events that precipitated this suit.

Charles Burba testified that Fiber Unique was in the business of "[b]uilding furniture." Charles Burba explained that Fiber Unique rented a building in Camden County from a corporation "owned" by Leo J. Christeson ("Leo Christeson").

The documents involved in this litigation were executed during the period from December 10, 1980, to December 16, 1980. The documents will be set out first, after which we will examine the testimony of the two witnesses, Leo Christeson and Charles Burba, wherein each presented his version of the circumstances that generated the documents.

On December 10, 1980, Leo Christeson and his wife, Eugenia A. Christeson, signed this document:

12–10 1980

"$25,000.00

For value received I promise to pay Chas R Burba or order, the sum of Twenty Five Thousand Dollars, with interest from this date at the rate of 18 per cent per annum, at _____ in monthly installments, payable as follows, to-wit: _____ Dollars on the 15th day of June 1981, and _____ dollars on the \_\_\_\_ day of each succeeding month thereafter, until the whole sum named is fully paid. Each installment shall be first applied in payment of the interest and then on the unpaid balance of the principal sum. If default is made in the payment of any installment when due, then all the remaining installments shall become due and payable at once. Privilege is given to pay two or more installments at any time.

s/ Leo J. Christeson

s/ Eugenia A. Christeson"

On December 11, 1980, Ridgway signed a document, the pertinent provisions of which were:

"Name FIBER UNIQUE, INC. 27753 Amount $25,000.00 No. 60730 Address Route 3, Jay, Oklahoma 74346 December 11, 1980

On or before December 24, 1980, I, we, or either of us, each as principal, unconditionally promise to pay to the order of CITIZENS NATIONAL BANK & TRUST COMPANY, Oklahoma City, Oklahoma at its banking house in Oklahoma City, Oklahoma the sum of TWENTY–FIVE THOUSAND AND NO/100 DOLLARS with interest thereon at the rate of 19 per cent per annum from December 11, 1980, payable at maturity

. . . .

SECURITY: This loan is secured by a Security Agreement dated N/A covering Open

and will secure future or other advances and will cover after-acquired property.

Purpose of credit Oper cap

FIBER UNIQUE, INC.

By: s/James D. Ridgway"

Charles Burba signed his name on the back of the above instrument. Although the certificate of incorporation for Fiber Unique showed the address of its registered office as "Highway 54 West, Osage Beach 85065," the above instrument showed Fiber Unique's address as Route 3, Jay, Oklahoma 74346. At trial, Charles Burba gave his address as Jay, Oklahoma.

In exchange for the above instrument, the Citizens National Bank & Trust Company of Oklahoma City ("the Oklahoma bank") sent a "wire" to the Bank of Lake of the Ozarks, Lake Ozark, Missouri ("the Missouri bank"), depositing $25,000 in a checking account of Fiber Unique in the Missouri bank.

On December 16, 1980, Leo Christeson signed the following document:

"PROMISSORY NOTE

December 16, 1980

$25,000.00

FOR VALUE RECEIVED, I promise to pay Charles R. Burba, or order, the sum of Twenty-Five Thousand and no/100 Dollars, with interest from this date, with the interest rate to be computed at ½% over the prime rate, as it is established from time to time, by Citibank of New York, at a place to be designated in writing by Charles R. Burba, accumulated interest to be due and payable 6 months from this date, and the principal sum, plus accumulated interest,

to be due and payable one year from this date. Any payment shall be first applied in payment of the interest and then on the unpaid balance of the principal sum. If default is made in the payment of any installment when due, then all of the remaining installments shall, at the option of the holder, become due and payable at once.

s/Leo J. Christeson"

On the same day (December 16), Leo Christeson, in his capacity as president of LJC Enterprises, Inc. ("LJC Enterprises"), a Missouri corporation, signed a deed of trust covering certain land owned by LJC Enterprises in Bates County, Missouri. Although the original of the deed of trust is not included in the record on appeal, it was established by the pleadings that the deed of trust was given to secure payment to Charles Burba of the December 16, 1980, promissory note signed by Leo Christeson. LJC Enterprises, according to Leo Christeson, was a corporation in which he was "the principal and owner of."

Another note was signed December 16, 1980. It was as follows:

"PROMISSORY NOTE

December 16, 1980

$25,000.00

FOR VALUE RECEIVED, the undersigned promises to pay to Leo J. Christeson and Eugenia A. Christeson, or order, the sum of Twenty-Five Thousand Dollars, with interest from this date at the rate of ½% over the prime rate, as it is established from time to time, by Citibank of New York, at a place to be designated in writing by holders, accumulated interest to be due and payable 6 months from this date, and payable one year from this date. Any payment shall be first applied in payment of the interest and then on the unpaid balance of the principal sum. If default is made in the payment of any installment when due, then all of the remaining installments shall, at the option of the holder, become due and payable at once.

FIBER UNIQUE COMPANY, INC.

By s/ James D. Ridgway

James Dean Ridgway, President

ATTEST:

s/ Chas R Burba

Secretary"

Leo Christeson concedes that he and Eugenia received the above note.

Another pertinent document also bore the date December 16, 1980. That document was styled: "Unanimous Written Consent of the Shareholders and the Board of Directors of Fiber Unique Company, Inc." For brevity, we henceforth refer to it as "the Consent."

The Consent stated, among other things, that a stock certificate previously issued to Ridgway for 175 shares would be surrendered to the corporation, that a new certificate for 62½ shares would be issued to Ridgway, and that another new certificate for 112½ shares would be issued to Leo Christeson.

The Consent further stated that Huske resigned instanter as a director of the corporation, and that Leo Christeson was elected to the board, so that the board would consist of Ridgway, Charles Burba, Patricia Burba, and Leo Christeson.

The Consent further provided that the corporation was authorized to borrow $25,-000 from Leo Christeson and Eugenia Christeson at an interest rate of one-half per cent over the prime rate established from time to time by Citibank of New York, with accrued interest due six months from the date of the note, and principal and accrued interest due one year from the date of the note.

The Consent was signed by Charles Burba, Patricia Burba, and Ridgway, but not by Huske.

The December 10 note payable to Charles Burba signed by Leo Christeson and Eugenia Christeson, and the December 16 note payable to Charles Burba signed by Leo Christeson alone, were not paid. The December 16 note payable to Leo Christe-son and Eugenia Christeson, made by Fiber Unique, was likewise never paid.

Charles Burba commenced foreclosure proceedings on the LJC Enterprises deed of trust securing the December 16 note signed by Leo Christeson. Leo Christeson and LJC Enterprises then commenced this suit seeking cancellation of those instruments. Surprisingly, the petition made no mention of the December 10 note payable to Charles Burba signed by Leo Christeson and Eugenia Christeson.

After the suit had been pending some 22 months, the petition was superseded by a first amended petition. As justification for cancelling the LJC Enterprises deed of trust and the December 16, 1980, note signed by Leo Christeson, the first amended petition alleged that those instruments were given to Charles Burba "wholly without consideration," and were never binding upon LJC Enterprises and Leo Christeson, respectively.

As an alternative ground for cancellation, the first amended petition averred that the consideration, if any in fact were given for the instruments, "was the sum of Twenty-Five Thousand Dollars ($25,000.00) purportedly deposited by ... Charles R. Burba to the checking account of Fiber Unique Company, Inc.; that Charles R. Burba was to obtain the unanimous written consent of all shareholders and Directors of Fiber Unique Company, Inc., as set out in [the Consent] attached hereto and incorporated herein by references thereto; that said consideration has wholly failed, in that Plaintiffs did not receive from ... Charles R. Burba said sum of Twenty-Five Thousand Dollars ($25,000.00), and the unanimous written consent of the shareholders and Directors of Fiber Unique Company, Inc. was not executed by all necessary parties, nor were all obligations therein fulfilled." The first amended petition, like the original petition, ignored the December 10, 1980, note signed by Leo Christeson and Eugenia Christeson.

At trial, Leo Christeson testified he became acquainted with Charles Burba through Ridgway. Leo Christeson admit-

ted signing the December 16, 1980, note payable to Charles Burba. Then, this:

"Q. Mr. Christeson, did you at any time ever receive from Mr. Burba the sum of $25,000?

A. No, no I never—I didn't.

Q. Did LJC Enterprises, Inc. at any time ever receive from Charles R. Burba the sum of $25,000?

A. No.

. . . . .

Q. Mr. Christeson, when you signed this note dated December 16, 1980, did you receive anything from Mr. Burba?

A. No.

Q. Did your corporation LJC Enterprises, Inc. receive anything?

A. No."

In his direct examination, Leo Christeson was not asked about the December 10, 1980, note signed by him and his wife, and he did not mention it.

Leo Christeson's cross-examination included this:

"Q. Can you tell me why and what you executed a note for $25,000.00 for to Charles Burba?

A. It was to be lent—which I never received, to Fiber Unique.

Q. It was for the purpose of $25,000.00 being given to Fiber Unique, is that correct?

A. That is right, uh, huh.

. . . . .

Q. Isn't it true, Mr. Christeson, that you didn't have available to you, yourself, $25,000.00 to put in Fiber Unique?

A. Sure.

Q. And Mr. Burba agreed to loan you $25,000.00?

A. Let's see—I suppose that would be agreeable. There wasn't anything in writing upon it.

. . . . .

Q. It was at your request that [LJC Enterprises] executed this Deed of Trust to Mr. Burba?

A. It was his request.

Q. He wanted security?

A. Right, yes.

Q. And that is all that you had to offer?

A. That is right, yes, uh huh.

Q. So there was an agreement reached prior to the execution of the note that $25,000.00 would be coming to you for the purpose of investing in Fiber Unique, is that correct?

A. Yes, that is right.

Q. In return you executed a Promissory Note for $25,000.00, is that true?

A. A Promissory Note, yes, I think so.

Q. And in addition you did execute a Deed of Trust, you and your wife?[1]

A. Yes.

Q. And your corporation?

A. Yes."

Later during his cross-examination, Leo Christeson was shown the December 10, 1980, note signed by him and Eugenia Christeson, and was asked this:

"Q. Now, is this at or about the date that there was an agreement reached where you were to get stock in Fiber Unique and also get a larger share of the ownership of this corporation?

A. A larger share of the ownership, yes.

. . . . .

Q. The purpose of the $25,000.00 loan from Charles Burba to you was so that you could put $25,000.00 in Fiber Unique, is that correct?

A. Yes, right—uh, huh.

. . . . .

Q. Isn't it true that shortly after your executing this first note, that you had your attorney, Mr. Hilton, draw up some documents which provided for you to receive 112½ shares of stock in Fiber Unique?

A. That is correct—that is right.

Q. Also the corporation was to give you a note for $25,000.00?

A. Yes, that is right, uh, huh.

. . . . .

1. As best we can determine from the record, the LJC Enterprises deed of trust, in addition to being signed by Leo Christeson as president, was attested by Eugenia Christeson as secretary.

Q. Mr. Christeson, what essentially has happened here, isn't it that you were interested in getting an ownership interest in Fiber Unique, is that correct?

A. Well, I was talked into it, I didn't bring up the subject, you know.

. . . . .

Q. Now, there was an agreement between you and Mr. Burba to the effect of him loaning you $25,000.00 and you put up as security for that loan, property that you owned in Bates County through your corporation?

A. That was the way that it was done technically—in the discussion I was to put up my farm for security and that is the way the papers were worked out.

Q. The paper work and the effect of the agreement is that the $25,000.00 was lent to you and as security, you and your corporation, your wife, executed a Deed of Trust upon the real estate in Bates County?

A. That is right, yes.

. . . . .

Q. Let me ask you—I will restate the question again. I did ask you if that Fiber Unique gave you 112½ shares of stock, if you were to be lent $25,000.00?

A. I already had stock in it from Dean Ridgway [sic] and I don't know what the amount was upon the additional stock, you know, what the number of shares were, but, yes, I was to receive some shares.

. . . . .

Q. Isn't it true that in December at least on December 16, 1980, that you were not a record stockholder of Fiber Unique?

A. I don't know—whether I was or not—I think I had some stock before that presumably. Whether it was handled or issued, I don't know. But I think that I had some stock before from Dean Ridgeway [sic], a part of his.

. . . . .

Q. Mr. Christeson, isn't in fact your contention the reason that you don't feel that you owe [the note signed by you on December 16, 1980] is because the note that I have shown you [made by Fiber Unique on December 16, 1980] for $25,000.00 to you has not been paid by Fiber Unique?

A. I think there is more reasons that that—more reasons than that because I have not received any money whatsoever in any respect. My corporation or me for the note that I signed to start with or that I borrowed upon my farm.

Q. Why did you sign the note then?

A. Uh, trust more than anything else that he would complete his end of the deal.

Q. Why did you wait until after foreclosure proceedings were started before you raised any objection to this note?

A. I thought—I still thought that it would be possible that I would get paid, you know.

Q. Well, getting paid—you are referring to this note right here, aren't you? The note of Fiber Unique which it promised to pay you $25,000.00?

A. Pay me $25,000.00 so that I could transfer the funds from the bank to him.

Q. So that you could pay Mr. Burba?

A. Yes."

Charles Burba testified that in 1980, Leo Christeson and Ridgway "were involved in a transportation company" that delivered furniture manufactured by Fiber Unique. According to Charles Burba, Leo Christeson, prior to December, 1980, owned no shares in Fiber Unique.

Charles Burba recounted that he learned from Ridgway that Leo Christeson was interested in investing in Fiber Unique. Consequently, said Charles Burba: "... I went to see [Leo Christeson] then and I told him that I was figuring on getting out of the company. I could not put any more money up, it was eating me up alive. And he said, 'Well, he would be interested but

he didn't have any cash—he had all of his cash tied up for the moment in houses.' He said, 'I have some property down here, if I could sell it real quick.' I said, 'If you have some collateral I could go ahead and sign a note at the bank for you, or with you, and you could borrow at the bank and do it that way.' So that is the way that it started."

Charles Burba explained that he and Leo Christeson ultimately agreed that the latter would invest $25,000, which would go "[d]irectly to Fiber Unique for the operating capital." On December 10, 1980, according to Charles Burba, he took Leo Christeson and Eugenia Christeson to the Missouri bank, where the Christesons signed the $25,000 note dated that day. Once that was done, said Charles Burba, he arranged for the Oklahoma bank to wire the $25,000 to the Missouri bank for deposit in Fiber Unique's account.

Charles Burba testified that in exchange for the $25,000 wired to the Missouri bank, the Oklahoma bank received the $25,000 note made December 11, 1980, by Fiber Unique. Charles Burba added that he signed that note on the back to "personally guarantee" it.

Asked to explain the December 16, 1980, note signed by Leo Christeson—the one secured by the LJC Enterprises deed of trust—Charles Burba responded that it was meant to replace the December 10 note, which he (Burba) had insisted on having before arranging for the "wire transfer" from the Oklahoma bank. According to Charles Burba: "... [I]t was going to take about four or five days for Mr. Hilton to get it drawed up. We had to go ahead and put money in the bank if we were to operate. We had to pay the employees at the time."

Charles Burba conceded that Leo Christeson "did not borrow $50,000." It is implicit, if not explicit, in Charles Burba's testimony that he acknowledges nothing is due him on the December 10, 1980, note.

With the case in this posture, the parties submitted it to the trial court with a request for findings of fact and conclusions of law.

The trial court found, among other things, that Leo Christeson paid no money to Fiber Unique, performed no labor for Fiber Unique, and transferred no property to Fiber Unique. There is, of course, substantial evidence in the record to support those findings, and no party challenges them. The trial court also found that Leo Christeson received no certificate for shares of stock in Fiber Unique. At time of trial, the "stock register" in Fiber Unique's corporate records showed that stock certificate number 7 for 112½ shares had been issued to Leo Christeson. Charles Burba, however, did not testify that the certificate had in fact been issued, and Leo Christeson testified that he had no stock certificate issued by Fiber Unique. The evidence, therefore, is adequate to support the trial court's finding, and Charles Burba does not challenge it.

After making its findings of fact (17 numbered paragraphs), the trial court made 10 numbered conclusions of law. Only three of them, numbers 4, 5, and 6, are attacked on this appeal. They are:

"4. Charles R. Burba is not a holder in due course of either the promissory note dated December 10, 1980 ... or the promissory note [signed by Leo Christeson] dated December 16, 1980.... § 400.-3–302, V.A.M.S.

5. No consideration was given for either the promissory note executed by Leo J. Christeson which was dated December 10, 1980 ... or the promissory note executed by Leo J. Christeson dated December 16, 1980....

6. Failure of consideration is a sufficient defense to the aforesaid promissory notes ... to entitle plaintiff Leo J. Christeson to the relief he seeks...."

The trial court entered judgment in favor of Leo Christeson and LJC Enterprises, and against Charles Burba. Specifically, the decree declared void, as between the parties to the suit, the promissory note signed December 10, 1980, by Leo Christeson and Eugenia Christeson—even though

such relief had not been prayed for and Eugenia Christeson was not a party to the suit—and also declared void the promissory note signed December 16, 1980, by Leo Christeson, and the LJC Enterprises deed of trust securing payment of the latter note. Charles Burba, hereafter called "appellant," appeals, briefing four assignments of error.

Before discussing any assignment of error, a few observations are appropriate.

First, Leo Christeson never testified specifically as to what he expected to receive for the $25,000 he intended to invest in Fiber Unique. About all that can be gleaned from his testimony is that when he and his wife signed the December 10, 1980, note, he expected to acquire "a larger share of the ownership" of Fiber Unique. According to Leo Christeson, he believed, at that time, that he already owned some shares in Fiber Unique. He did not, however, reveal when or how he had acquired them, or how many there were. All he said was that he had gotten some shares from Ridgway.

Second, it is logical to assume that Leo Christeson, on December 10, 1980, did in truth expect to acquire some shares of Fiber Unique. The only other thing he ever received was the unsecured $25,000 note of Fiber Unique dated December 16, 1980, which bore the same interest rate as the $25,000 note he signed that date to appellant. It would be naive to assume that all Leo Christeson expected in exchange for his well-secured note to appellant was an unsecured note in the same amount, bearing the same interest, from Fiber Unique.

Third, it can be reasonably inferred that when Leo Christeson signed the $25,000 December 16 note, and the deed of trust securing it, he knew about the $25,000 that had been "wired" five days earlier by the Oklahoma bank to the Missouri bank for deposit in Fiber Unique's account. Leo Christeson, on cross-examination, conceded he had seen the deposit slip evidencing that transaction. More importantly, however, he knew that *he* had not turned any money

over to Fiber Unique; yet, he was receiving a $25,000 note from Fiber Unique plus the Consent that showed he was to be issued a certificate for 112½ shares of Fiber Unique, and that he was elected a director of Fiber Unique. There would have been no reason for Fiber Unique to do those things unless Fiber Unique was receiving something in return. That "something," of course, was the $25,000 deposit of December 11. True, that deposit was arranged by appellant through the Oklahoma bank, but appellant testified he would not have placed his signature on the $25,000 note made by Fiber Unique to the Oklahoma bank on December 11 if he had not received the $25,000 note signed by Leo Christeson and Eugenia Christeson December 10.

Thus, even though the $25,000 that went into Fiber Unique's account on December 11 never passed through Leo Christeson's hands, it can be reasonably assumed that he knew about it, and that he had no complaint. Had he disapproved of the way in which that transaction had been handled, it is logical to assume that he would not have signed the $25,000 note and the LJC Enterprises deed of trust to appellant on December 16, and would not have accepted Fiber Unique's $25,000 note on that date.

Fourth, the only thing that Fiber Unique parted with on December 16 was its $25,-000 note to Leo Christeson and Eugenia Christeson. Even if the stock transaction reflected in the Consent had been completed, Fiber Unique would have given up no shares. The 112½ shares Leo Christeson was to have received would have come from Ridgway. This is demonstrated by the fact that, according to the Consent, Ridgway was surrendering his 175 shares, and was to receive back only 62½ shares. The remaining 112½ shares previously owned by Ridgway were to be issued to Leo Christeson. Nothing in the Consent indicated that Fiber Unique was paying Ridgway anything for the surrender of his 175 shares. Thus, if anyone should have received something for the 112½ shares going to Leo Christeson, it appears that it should have been Ridgway, not Fiber

Unique. All Fiber Unique had to do was issue new certificates reflecting (1) a transfer of 112½ of Ridgway's 175 shares from him to Leo Christeson, and (2) the retention by Ridgway of his remaining 62½ shares.

Fifth—and this is the heart of the matter—while it appears on cursory examination that Leo Christeson, Fiber Unique, and appellant each ended up in the same position as they would have if appellant, on December 11, 1980, had handed Leo Christeson $25,000, and Christeson had in turn handed the $25,000 to Fiber Unique, such is not the case.

Leo Christeson testified, and the trial court found, that he (Christeson) intended to borrow $25,000 from appellant. Leo Christeson would then invest that $25,000 in Fiber Unique. It was, of course, no concern of Leo Christeson's as to how or where appellant got the $25,000 that appellant was going to loan Christeson. The important thing was that the $25,000 was going to come from appellant.

That, however, is not what happened.

Appellant did not supply Leo Christeson $25,000 from appellant's own funds, nor did appellant, *in his individual capacity*, borrow $25,000 to lend to Leo Christeson.

Instead, *Fiber Unique*, on December 11, borrowed $25,000 from the Oklahoma Bank, which wired that sum to the Missouri bank for deposit in Fiber Unique's account. Thus, Fiber Unique, on December 11, incurred a $25,000 liability to the Oklahoma bank. All appellant did was guarantee that obligation.

Then, Fiber Unique, on December 16, made another $25,000 note, this time to Leo Christeson and Eugenia Christeson. Thus, when all of the papers had been shuffled, Fiber Unique had received $25,000 in its account in the Missouri bank, but had incurred $50,000 in liabilities—$25,000 to the Oklahoma bank and $25,000 to Leo Christeson and Eugenia Christeson. Appellant had a $25,000 note signed by Leo Christeson, secured by the LJC Enterprises deed of trust. Leo Christeson had a $25,000 unsecured note from Fiber Unique payable to him and his wife. Leo Christeson may also have had a right to demand that Fiber Unique issue him a certificate for 112½ shares,[2] though we need not decide that.

If all of the notes had been paid—excluding, of course, the December 10 note upon which appellant asserts no claim—Fiber Unique would have ended up paying $50,000 plus interest ($25,000 plus interest to the Oklahoma bank and $25,000 plus interest to Leo Christeson and Eugenia Christeson), Leo Christeson would have ended up paying $25,000 plus interest to appellant, and appellant would have pocketed a $25,000 windfall, plus interest. In effect, Fiber Unique (in which Leo Christeson was ostensibly acquiring a 22½ per cent ownership interest) would have supplied Christeson the money he needed in order to pay appellant the $25,000 plus interest that he (Christeson) owed on his December 16 note to appellant, and Fiber Unique would also have paid the Oklahoma bank the $25,000— plus interest—that appellant was originally going to loan Christeson. Thus, Fiber Unique would have paid twice for the $25,-

---

**2.** Even though the Consent was not signed by Huske, it nonetheless appears valid. Article III, § 6, of Fiber Unique's bylaws provided: "A majority of the Board of Directors shall constitute a quorum for the transaction of business. The act of the majority of the directors present at a meeting at which a quorum is present shall be the act of the Board of Directors." Furthermore, Huske's ownership interest in Fiber Unique would not have been affected by the transfer of 112½ of Ridgway's 175 shares to Leo Christeson, and we find nothing in the articles of incorporation or the bylaws of Fiber Unique that would have given Huske power to block that transaction. Indeed, Article Four of the articles of incorporation provided, in pertinent part: "No holder of shares of the corporation nor of any security convertible into, nor of any warrant, option or right to purchase, subscribe for or otherwise acquire, shares of any class of the corporation, whether now or hereafter authorized, shall, as such holder, have any preemptive right to purchase, subscribe for or otherwise acquire shares of any class of the corporation or any security convertible into, or any warrant, option or right to purchase, subscribe for or otherwise acquire shares of any class of the corporation, whether now or hereafter authorized."

000 it received December 11 (once to Leo and Eugenia Christeson and once to the Oklahoma bank). Leo Christeson would have ended up with the same amount of money he started with, and appellant would have paid nothing but would have collected $25,000 plus interest. Appellant, in short, would have pulled $25,000 plus interest out of Fiber Unique.

Unfortunately for appellant, things did not turn out that way. Fiber Unique's certificate of incorporation was forfeited January 1, 1982, by the Secretary of State of Missouri, and Fiber Unique's $25,000 note of December 11, 1980, to the Oklahoma bank was never paid by Fiber Unique, leaving appellant liable on his guaranty.

Sixth, while it seems that appellant would have gotten the best end of the deal had Fiber Unique been able to pay both of its $25,000 notes, such is not necessarily true. We observed above that Leo Christeson would have apparently wound up with 112½ shares out of the 500 outstanding shares of Fiber Unique. He thus would have acquired a 22½ per cent ownership interest in Fiber Unique at a net cost to him of zero, an adroit maneuver had Fiber Unique proved to be a viable company.

▮ Having deduced this much, we now turn to appellant's assignments of error, the first of which states:

"The trial court erred in concluding, at Conclusion No. 4, that Charles R. Burba is not a holder in due course of either the promissory note dated December 10, 1980 ... or the promissory note dated December 16, 1980 [signed by Leo Christeson] because Mr. Burba took both instruments for value, in good faith, and without notice that they were overdue or had been dishonored or of any defense against or claim to them on the part of any person in that Mr. Burba performed a valuable consideration by endorsing a promissory note, thereby assuming liability upon said note, and no other evidence was introduced at trial tending to show

that Mr. Burba took either instrument in bad faith or with notice that each was overdue or had been dishonored or of any defense against or claims to each note on the part of any person."

Appellant, at the outset of his argument under this point, repeats the admission he made at trial that the December 16 note signed by Leo Christeson was meant to replace the December 10 note signed by Leo Christeson and Eugenia Christeson. The argument continues by saying, "Essentially then, Charles R. Burba is claiming that he is a holder in due course of the promissory note dated December 16, 1980 [signed by Leo Christeson]." Further along in the argument, we learn why appellant is insisting he is a holder in due course. The argument states: "As a holder in due course of said instrument, he is not subject to the defense of failure of consideration.... Therefore, the trial court erred in stating that failure of consideration is a valid defense for Plaintiffs."

Boiled down, appellant is maintaining he is a holder in due course of the December 16 note signed by Leo Christeson, therefore he took such note free from the defense of failure of consideration. Consequently, theorizes appellant, it is immaterial whether there was consideration for the note or, if there were consideration, whether the consideration failed.

Appellant, in tendering this hypothesis, overlooks two crucial provisions of the Uniform Commercial Code—Commercial Paper. They are found in §§ 400.3–305 and 400.3–306.[3]

Section 400.3–305 states, in pertinent part:

"To the extent that a holder is a holder in due course he takes the instrument free from

. . . . .

(2) all defenses of any party to the instrument *with whom the holder has not dealt....*" (Emphasis added.)

Section 400.3–306 states, in pertinent part:

---

**3.** References beginning with "§" are to RSMo 1978.

"Unless he has the rights of a holder in due course any person takes the instrument subject to

. . . . .

(b) all defenses of any party which would be available in an action on a simple contract; and

(c) the defenses of want or failure of consideration . . . ."

 By reason of the above provisions, even if appellant were a holder in due course of the December 16 note signed by Leo Christeson [4]—a question we need not decide—appellant would not, *as against Christeson*, hold the note free of the defenses of want of consideration or failure of consideration. That is because Leo Christeson is a person with whom appellant dealt, and under the above provisions those defenses would be available to Christeson. Where the person attempting to enforce a note is the payee and is the person to whom the maker has given the note, the maker has available all defenses which would be available in an action on a simple contract. *Duggins v. Simons*, 517 S.W.2d 82, 89[1] (Mo.1974); *Haretuer v. Klocke*, 709 S.W.2d 138, 139[2] (Mo.App.1986). This includes the defense of failure of consideration. *Duggins*, 517 S.W.2d at 89[1]. Accordingly, appellant's premise that Leo Christeson is precluded from asserting that there was a want of consideration or a failure of consideration for the December 16 note Christeson signed is without merit. Appellant's first point is denied.

Appellant's second point states:

"The trial court erred in concluding at Conclusion No. 5, that no consideration was given for either the promissory note executed by Leo J. Christeson which was dated December 10, 1980 . . . or the promissory note executed by Leo J. Christeson dated December 16, 1980 . . .

because Charles R. Burba suffered a detriment, as the promisee, which amounted to sufficient consideration to support the contract, in that he endorsed a promissory note, thereby assuming liability upon said note."

The promissory note that appellant "endorsed" was, of course, Fiber Unique's note of December 11, 1980, to the Oklahoma bank, which caused that bank to wire $25,000 to the Missouri bank for deposit in Fiber Unique's account. No party to this appeal questions the premise that appellant, by signing that note on the back, became an accommodation party, and thereby assumed liability for paying the note if Fiber Unique failed to do so. *See:* White and Summers, Handbook of the Law under the Uniform Commercial Code, §§ 13–12 and 13–13 (2d ed. 1980); and § 400.3–415.

 It is well settled that a valuable consideration sufficient to support a simple contract may consist of some right, interest, profit, or benefit accruing to one party, or some forbearance, loss, or responsibility given, suffered, or undertaken by the other. *Perbal v. Dazor Manufacturing Corp.*, 436 S.W.2d 677, 697[55] (Mo.1968); *Charles F. Curry and Co. v. Hedrick*, 378 S.W.2d 522, 533[11] (Mo.1964). Here, by assuming liability for paying Fiber Unique's note to the Oklahoma bank if Fiber Unique defaulted, appellant unquestionably undertook a responsibility not otherwise his. In our view, that constituted consideration sufficient to support a note by Leo Christeson payable to appellant.[5]

That conclusion, however, does not resolve this appeal. There were, as we have seen, *two* notes bearing Leo Christeson's signature payable to appellant. One was the unsecured note of December 10, 1980,

---

**4.** Section 400.3–302(2) provides: "A payee may be a holder in due course." Circumstances in which that can occur are listed in paragraph 2, Uniform Commercial Code Comment under § 400.3–302.

**5.** A factual situation analogous to the one here is found in *Doggett v. Heritage Concepts, Inc.*,

298 N.W.2d 310 (Iowa 1980). The court there held that the act of an individual in guaranteeing two notes made by a corporation, the proceeds of which were used to pay creditors of another corporation, was adequate consideration to support two notes payable to that individual made by the latter corporation.

signed by Leo Christeson and his wife, Eugenia, and the other was the note of December 16, 1980, signed by Leo Christeson alone, secured by the LJC Enterprises deed of trust. Which note, one may ask, was given in consideration for appellant's signing the December 11 note of Fiber Unique payable to the Oklahoma bank?

The answer, in our view, appears in appellant's testimony. He explained that he had been unwilling to incur any new liability for Fiber Unique unless he received a note signed by Leo Christeson and the latter's wife. After receiving the December 10 note signed by the Christesons, appellant, the following day, signed, as an accommodation party, Fiber Unique's note to the Oklahoma bank. That note, as we have seen, resulted in the deposit of $25,000 to Fiber Unique's account in the Missouri bank.

■ What, then, was the consideration for the December 16 note signed by Leo Christeson, secured by the LJC Enterprises deed of trust? The answer, we believe, is obvious.

It is clear from Leo Christeson's testimony that the transaction that spawned this litigation was not one in which he was to merely borrow $25,000 from appellant and loan it to Fiber Unique. By his own admission, Leo Christeson intended to acquire some shares of Fiber Unique. On December 10, he did not receive any shares, or anything indicating he was entitled to any. Obviously, the transaction was not completed on December 10 or December 11.

It took until December 16 for the transaction to be finalized. On that day, Leo Christeson received Fiber Unique's $25,000 note payable to him and his wife. Additionally, according to the Consent, Leo Christeson was elected a director of Fiber Unique, and he was to be issued a certificate for 112½ shares. Leo Christeson admitted at trial that it was his attorney who drew the documents by which he was to receive those shares. Leo Christeson, on December 16, gave appellant his (Christeson's) $25,000 note, secured by the LJC Enterprises deed of trust. That note, ac-

cording to appellant, was to replace the December 10 note signed by the Christesons. Appellant's surrender of his claim against Leo and Eugenia Christeson on the December 10 note in exchange for the December 16 note made by Leo Christeson supplied valuable consideration for the latter note. Moreover, Leo Christeson, on December 16, received Fiber Unique's note for $25,000 payable to him and his wife. That note supplied additional consideration for Leo Christeson's note of December 16 to appellant. The fact that Fiber Unique's note ultimately proved uncollectible did not alter the fact that it was a valid consideration for Leo Christeson's December 16 note to appellant. *Citizens' Bank of Edina v. Kriegshauser,* 211 Mo.App. 33, 244 S.W. 107, 109[1] (1922).

True, the December 10 note was apparently not returned to Leo Christeson on December 16, but appellant conceded at trial that nothing is due him on the December 10 note. Furthermore, and we find this significant, Leo Christeson, in this action, did not seek cancellation of the December 10 note, nor did he contradict appellant's testimony that his (Christeson's) December 16 note was given to appellant to replace the December 10 note.

We recognize, of course, that what occurred during the period from December 10 to December 16 was not what the parties had initially discussed. It is manifest, however, that Leo Christeson, who by December 16 had obtained the assistance of counsel, accepted what was given him that date, and simultaneously gave appellant his (Christeson's) $25,000 note.

Leo Christeson argues that the consideration he was supposed to have received for his December 16 note was (a) $25,000 from appellant, (b) shares in Fiber Unique, and (c) a $25,000 note from Fiber Unique. While that may have been what was originally talked about, Leo Christeson obviously did not, on December 16, expect to receive $25,000 from appellant. If Leo Christeson had harbored that expectation on December 16, it is unlikely that he would have given appellant his (Christe-

son's) note and the LJC Enterprises deed of trust without receiving $25,000 from appellant. Even more persuasive is the fact that $25,000 of new operating capital had been put in Fiber Unique's account by virtue of the December 11 transaction with the Oklahoma bank. It is unreasonable to assume that Leo Christeson, on December 16, expected to receive $25,000 from appellant, and simultaneously turn that sum over to Fiber Unique. That would have made $50,000 of new operating capital, and no one testified that Fiber Unique was to receive that amount.

We are therefore persuaded, and accordingly hold, that irrespective of whether the Consent vested Leo Christeson with equitable ownership rights in 112½ shares of Fiber Unique, there was valuable consideration to support Leo Christeson's December 16 note to appellant. The trial court erred in ruling to the contrary in its Conclusion No. 5. Appellant's second point is thus meritorious.

Inasmuch as Leo Christeson's note of December 16 to appellant was supported by valuable consideration, there was no justification for declaring it void. Consequently, that portion of the judgment declaring void, as between the parties to this suit, the December 16, 1980, note signed by Leo Christeson, and the LJC Enterprises deed of trust securing such note, must be reversed.

That does not mean, however, that the entire judgment must be reversed. We pointed out earlier that the judgment also declared void, as between the parties to this action, the December 10, 1980, note signed by Leo Christeson and Eugenia Christeson. At trial, and on this appeal, appellant concedes nothing is owed him on that note, and he assigns no error in the trial court's declaration that such note is void. Accordingly, that portion of the trial court's judgment should not be disturbed.

Having reached these conclusions, we need not lengthen this opinion by considering appellant's other two assignments of error.

In deciding this case, we are not oblivious that Leo Christeson, by virtue of our holding, faces a substantial loss. However, as appellant aptly reminds us, the policy of the law is to let the parties weigh the benefits pro and con and to leave them free to make whatever contract between themselves that they please. *Hathman v. Waters*, 586 S.W.2d 376, 385 (Mo.App. 1979). The general rule of freedom of contract includes the freedom to make a bad bargain. *Sanger v. Yellow Cab Company, Inc.*, 486 S.W.2d 477, 481–82[6] (Mo. banc 1972).

That portion of the judgment declaring void, as between the parties to this action, the note dated December 10, 1980, signed by Leo Christeson and Eugenia Christeson is affirmed. That portion of the judgment declaring void, as between the parties to this action, the December 16, 1980, note signed by Leo Christeson alone, and the LJC Enterprises deed of trust securing such note, is reversed.

Costs of this appeal are taxed half against appellant and half against Leo Christeson and LJC Enterprises.

PREWITT, C.J., HOGAN, P.J., and MAUS, J., concur.