**ROBERTS FERTILIZER,
INC., Appellant,**

v.

**G. Wayne STEINMEIER, et al.,
Respondents.**

**No. WD 39422.**

Missouri Court of Appeals,
Western District.

March 29, 1988.

George A. Pickett, Frost, Fisher & Pickett, Plattsburg, for appellant.

Kristin L. Farnen, Morrison, Hecker, Curtis, Kuder & Parrish, Kansas City, for respondent, Smithville Citizens Bank and Trust Co.

Before COVINGTON, J., Presiding, and SHANGLER and TURNAGE, JJ.

COVINGTON, Judge.

Roberts Fertilizer, Inc., appeals from an order granting Smithville Citizens Bank and Trust Company's motion for summary judgment in Roberts' action for payment of one or the other of two checks drawn on the Bank in the amount of $70,500.00. Affirmed.

G. Wayne Steinmeier purchased fertilizer on account from appellant Roberts Fertilizer, Inc. On the 20th day of December, 1984, Mr. Steinmeier entered into a separate agreement with Roberts for payment of his overdue account. As part of that agreement, Steinmeier gave to Roberts a check in the amount of seventy thousand five hundred dollars ($70,500.00) drawn on Citizens Bank and Trust Company of Smithville. By the terms of the agreement, Roberts was not to deposit the check before January 20, 1985.

On January 21, 1985, Larry Roberts, president of Roberts, went to the Citizens Bank and Trust Company of Smithville to cash the Steinmeier check. Before taking the Steinmeier check into the Bank, Mr. Roberts telephoned the Bank to ask whether he could cash it. Ms. Virginia Cole, the Bank's vice president and cashier, checked the Steinmeier account upon which the check was drawn and found that it contained approximately $6,000.00.

Ms. Cole, then, by intercom, asked the president of the Bank, Paul Shy, whether she should cash the Steinmeier check. Mr. Shy understood Ms. Cole to say that the amount of the Steinmeier check was $7,000.00 rather than $70,000.00. Based upon the belief that the Steinmeier check was for $7,000.00 and based on the knowledge that Mr. Steinmeier had another account with the Bank containing approximately $13,000.00, Mr. Shy told Ms. Cole to cash the check. Steinmeier's check was taken from Roberts, and the Bank issued a bank disbursement check in the amount of seventy thousand five hundred dollars ($70,500.00). Language on the face of the bank disbursement check stated that the check was "not good for more than $50,-000.00." Other wording on the face of the check stated it was a "Disbursement Account (Not a Cashier's Check)."

On January 21, 1985, Steinmeier did not have funds sufficient in any of his accounts with the Bank to cover the $70,500.00 check he had issued to Roberts. Steinmeier's account was never debited for the $70,-500.00.

After Mr. Roberts left the Bank with the disbursement check on January 21, Ms. Cole expressed surprise to Mr. Shy that he would authorize overdrawing the Steinmeier account by $64,000. Mr. Shy asked what Ms. Cole meant, and she told him that she had issued a $70,500.00 check. This is the first time Mr. Shy discovered the mistake.

A check drawn on the Bank, when received for payment, is sent through a proof machine which encodes the check and proofs the tape to make sure that it is in balance. The check then goes to a computer center. If the funds in the account are insufficient, the check will "kick out" at the computer center and the center will send it back to the Bank the next day as an unposted item. The Bank receives the printout of all items which have been rejected, and the Bank pulls them. The Steinmeier check was on the unposted list on January 22, 1985, and was pulled. The check had never been marked paid, and the Steinmeier account was never charged.

On the morning of January 22, 1985, Mr. Roberts prepared a deposit to take to Roberts' bank in Gower, Missouri. He noticed that the disbursement check said "Disbursement Account (Not a Cashier's Check)" and that it said "Not Good for More than $50,000.00." He also noted that the check was made payable for $70,500. Mr. Roberts drove to the bank at Gower and asked the president of the Gower Bank what the language on the check meant. The president of the Gower Bank indicated to Roberts that he was uncertain of the meaning of the highly unusual language.

The president of the Gower bank telephoned the Smithville Bank concerning the language on the face of the disbursement check. Ms. Cole at that time told the president of Gower Bank to deposit the disbursement check. Mr. Roberts, however, elected to go to the Smithville Bank to see Mr. Shy. Mr. Roberts requested a cashier's check to replace the bank disbursement check, and Mr. Shy responded that he would not be able to honor the bank disbursement check. Mr. Shy stated that Mr. Steinmeier did not have sufficient funds in his account and explained to Mr. Roberts the mistake that had been made. Mr. Roberts testified that Mr. Shy offered to give Roberts the Steinmeier check in exchange for the bank disbursement check; Roberts, however, "didn't think that it was prudent business on his part."

Mr. Shy and Mr. Roberts discussed alternatives for remedying the situation, one of which was the possibility of the Bank's lending money to Mr. Steinmeier to pay Roberts.

At two o'clock on January 22, 1985, Mr. Roberts talked with Mr. Shy to inquire whether Roberts could get another check. Mr. Shy responded negatively, stating that he and Mr. Steinmeier were unable to reach agreement on loan terms. Mr. Roberts telephoned Steinmeier who confirmed that no loan would be made.

Roberts brought an action in the Circuit Court of Platte County, Missouri, suing Steinmeier and Smithville Citizens Bank and Trust Company in a two-count petition. Count I stated a cause of action solely against Steinmeier and sought recovery of the sum of $70,500. This action was based upon the check which was executed by Steinmeier and made payable to Roberts. Roberts alleged that this check was returned by the Bank for insufficient funds which resulted in the nonpayment by Steinmeier to Roberts of the sums due and owing to Roberts.

Count II of Roberts' petition stated a cause of action against the Bank. Roberts alleged payment of the Steinmeier check by the Bank and alleged additional liability on the bank disbursement check. After responsive pleadings were filed by both Steinmeier and the Bank, both Roberts and the Bank requested summary judgment. The trial court entered summary judgment on Count I for Roberts and against Steinmeier in the amount of $70,500. The trial court entered summary judgment on Count II in favor of the Bank. Neither Roberts nor Steinmeier has appealed the judgment entered by the trial court on Count I. Roberts now appeals the summary judgment entered in favor of the Bank on Count II.

Review of summary judgment is equivalent to review of a court-tried or equity proceeding, and if, as a matter of law, the judgment is sustainable on any theory, the judgment of the trial court must be sustained. *Snowden v. Northwest Mo. State Univ.*, 624 S.W.2d 161, 165 (Mo. App.1981). Review is made of the entire record in a light most favorable to the party against whom summary judgment is entered. *Fisher v. Scott & Fetzer Co.*, 664 S.W.2d 662, 663 (Mo.App.1984). An appellate court will not reverse a correct result even where granted for the wrong reasons, and if defendant's contention is valid, the summary judgment entered by the trial court will be sustained even if the argument was not presented in the trial court. *Westbrook v. Mack*, 575 S.W.2d 921, 924 (Mo.App.1978). The reviewing court first determines whether there is any genuine issue of material fact requiring trial, and, second, whether the judgment is correct as a matter of law. *State v. Board of Election Commissioners*, 686 S.W.2d 888, 892 (Mo.App.1985); Rule 74.04(c). The moving party has the burden to show by unassailable proof that he is entitled to judgment as a matter of law. Rule 74.04(c), (h).

Definitions of terms used in the Missouri Uniform Commercial Code, Articles 3 and 4, §§ 400.3–101 to 400.4–504,[1] are essential to an understanding of the transactions at

1. All references are to RSMo 1978, unless otherwise noted.

issue. The Steinmeier check was a "negotiable instrument," defined in § 400.3–104(1), RSMo Supp.1984, as "any writing ... signed by the maker or drawer, [which] contain[s] an unconditional promise or order to pay a sum certain in money ..., payable on demand or at a definite time, ... and payable to order or to bearer." Because it was payable to order, it was a "draft," § 400.3–104(2)(a), RSMo Supp. 1984; and, because it was a draft "drawn on a bank and payable on demand," it was a "check," § 400.3–104(2)(b), RSMo Supp. 1984. Because checks are "instruments for the payment of money," they are "items," § 400.4–104(1)(g), RSMo Supp. 1984.

Steinmeier was the "drawer" of the Steinmeier check. The Bank was the "payor bank" (or "drawee bank") on the Steinmeier check because the check was "payable as drawn" by the bank. § 400.4–105(b). Roberts was the "payee." It was also a "holder" of the Steinmeier check. "Holder" is defined in § 400.1–201(20) as a "person who is in possession of ... an instrument ... drawn, issued or indorsed to him or to his order or to bearer or in blank."

A payee or holder makes "presentment" when he makes "a demand for acceptance or payment ... upon the maker, acceptor, drawee or other payor." § 400.3–504(1). If, upon presentment, "payment is refused or cannot be obtained within the prescribed time," the check is said to have been "dishonored." § 400.3–507(1), RSMo Supp. 1984. The "prescribed time" within which a payor bank must either pay or dishonor an item is determined with reference to the Bank's "midnight deadline," defined in § 400.4–104(1)(h), RSMo Supp.1984 as "midnight on its next banking day following the banking day on which it receives the relevant item." A drawee bank may not dishonor a check once it has made "final payment" of the check as defined in § 400.4–213. Until the drawee bank pays or "accepts" (§ 400.3–410) a check, it is not liable on the check; that is, the drawee bank has no obligation to the payee or any holder to pay the check unless it first accepts it. § 400.3–409(1). Acceptance is defined in § 400.3–410(1) as "the drawee's signed engagement to honor the draft as presented." Certain instruments, most notably cashier's checks, may be deemed accepted upon issuance. *See, e.g., Seifert v. Seifert,* 708 S.W.2d 150, 154 (Mo.App.1985).

Under § 400.4–213(1):

An item is finally paid by a payor bank when the bank has done any of the following, whichever happens first:

(a) paid the item in cash; or

(b) settled for the item without reserving a right to revoke the settlement and without having such right under statute, clearing house rule or agreement; or

(c) completed the process of posting the item to the indicated account of the drawer, maker or other person to be charged therewith; or

(d) made a provisional settlement for the item and failed to revoke the settlement in the time and manner permitted by statute, clearing house rule or agreement.

Upon a final payment under subparagraph (b), (c) or (d) the payor bank shall be accountable for the amount of the item.

■ Roberts first alleges that there was a genuine issue of material fact as to whether the Bank sent notice of dishonor of the Steinmeier check before the Bank's midnight deadline. § 400.4–302(a). Roberts does not specify, nor does a review of the record disclose, any material facts in dispute. Summary judgment is not precluded if the "facts" alleged to be in dispute are actually differing opinions of the parties of the legal effect of documents or actions which determine their respective rights. *66 Terminal, Inc. v. Roberts,* 448 S.W.2d 938, 939 (Mo.App.1969). The test to be applied is whether the factual dispute, if one exists, is of such legal probative force as would control or determine the litigation, and hence preclude the entry

of summary judgment. *Ware v. St. Louis Car Co.*, 384 S.W.2d 287, 290 (Mo.App. 1964).

Roberts' president, Larry Roberts, admitted in his deposition that the Bank's president, Paul Shy, on January 22, 1985, prior to the bank's midnight deadline, told Roberts that he was not going to honor the check from Steinmeier. Roberts does not dispute that fact, but argues that further statements by Shy, to the effect that Shy would see about making a loan to Steinmeier to cover the check, created uncertainty as to the Bank's intention to dishonor the check. The Bank does not dispute the statements of Mr. Shy but argues that the notice of dishonor, although unnecessary, was nonetheless effective. This is a legal, rather than a factual, dispute.

■ Furthermore, in its motion for summary judgment, the Bank did not rely upon the giving of timely notice of dishonor; rather, it asserted that it had returned the Steinmeier check prior to its midnight deadline. Roberts does not dispute that Paul Shy returned the Steinmeier check to Larry Roberts on January 22, 1985. Because return of an item before the midnight deadline is equally effective to defeat liability under § 400.4–302(a), the Bank's failure to prove timely notice of dishonor would not preclude the entry of summary judgment. The alleged issue of fact is not material within the meaning of *Ware*, 384 S.W.2d at 290.

Roberts' second point alleges that the Bank's issuance of its bank disbursement check in exchange for the Steinmeier check constituted final payment of the Steinmeier check "in cash" under § 400.4–213(1)(a). Roberts contends that the Bank's subsequent discovery of its mistake in issuing the check came too late to terminate its duty to pay. § 400.4–303(1)(b).

Section 400.4–213(1)(a) is set forth *supra*. Section 400.4–303(1)(b) provides in part:

Any knowledge, ... received by ... a payor bank, whether or not effective under other rules of law to terminate, suspend or modify the bank's right or duty to pay an item ... comes too late to so terminate, suspend or modify such right or duty if the knowledge ... is received ... and a reasonable time for the bank to act thereon expires ... after the bank has done any of the following:

....

(b) paid the item in cash;

In effect, Roberts asserts that final payment had been made on the Steinmeier check because the bank disbursement check, which was issued for the Steinmeier check, was tantamount to a cashier's check and, therefore, equivalent to cash.

■ Had the bank disbursement check been a true cashier's check, Roberts' assertion would, more arguably, have merit. The bank disbursement check at issue in this case, however, was not a cashier's check, and it lacked the essential attributes of cash. The bank disbursement check not only stated on its face that it was void for amounts over $50,000.00, but also stated explicitly that it was not a cashier's check. Because the denomination of an instrument as a cashier's check puts the holder on notice that the instrument is a primary obligation of the bank, the denomination accounts for the check's acceptability in the commercial arena as a substitute for cash. The disclaimers on the face of the bank disbursement check were essentially a warning that the check should not be treated as cash. Indeed, the language on the face of the check caused Larry Roberts to be concerned about its validity and to refrain from depositing it. Although a different question would have been presented had the bank issued a true cashier's check, the bank disbursement check was not the equivalent of a cashier's check, nor of cash, and it did not effect a final payment in cash under § 400.4–213(1)(a), nor operate as a payment in cash under § 400.4–303(1)(b).

Roberts also argues that the Bank failed to establish by unassailable proof that it did not complete the process of posting the Steinmeier check. Completing the process of posting (§ 400.4–109) an item constitutes

a final payment of the item under § 400.4–213(1)(c). Had the Bank completed the process of posting the Steinmeier check, the Bank would be accountable for the amount of the item under that section.

■ It is clear from the record that the Bank did not complete the process of posting. Virginia Cole testified that the Steinmeier check "kicked out" at the computer center as an item drawn on insufficient funds, and that it was returned to the bank on January 22, 1985, as an unposted item. Roberts has not controverted that testimony. The only fact alleged by Roberts which even arguably relates to posting was that the bank provisionally credited the bank disbursement account with a deposit of $70,500.00. The evidence is unequivocal, however, that this provisional entry, subsequently reversed before the midnight deadline, was made prior to and independently of any final action on the Steinmeier check. The entry did not complete the process of posting the Steinmeier check; therefore, the Bank did not make final payment on the Steinmeier check under § 400.4–213(1)(c).

In its final point, Roberts argues that the bank disbursement check was tantamount to a cashier's check because it was drawn by the bank on itself, and was, therefore, accepted upon issuance. As discussed in connection with Roberts' second point, the bank disbursement check does not have the properties of a cashier's check.

Roberts assumes that the bank disbursement check falls within the scope of Article 3. A bank disbursement check is not a common instrument. The words "Not Good for More than $50,000.00" on the face of the check raise a serious question as to whether the check is a negotiable instrument.

■ To address the issue of negotiability, however, is unnecessary. The Bank is not liable to Roberts on the bank disbursement check under either ordinary principles of contract law or principles of Article 3.

Unless he has the rights of a holder in due course, any person takes an instrument subject to all defenses of any party which would be available on a simple contract, and, specifically, the defenses of want or failure of consideration. § 400.3–306(b), (c); *Christeson v. Burba*, 714 S.W.2d 183, 193 (Mo.App.1986). The sole "consideration" for the bank disbursement check and the promise to pay the bank disbursement check was the Steinmeier check. Once the Bank determined that the funds in Steinmeier's account were insufficient and decided not to pay the Steinmeier check, the Steinmeier check was without value.

Even if a holder were a holder in due course, he would take the instrument free from "all defenses of any party to the instrument *with whom the holder has not dealt*...." § 400.3–305(2). *See Christeson v. Burba*, 714 S.W.2d at 193, which applies this provision to the maker of a note and holds that failure of consideration can be asserted by the maker as a defense in an action by the payee where the payee deals directly with the maker. For cases holding that the defense is available as between the immediate parties to a cashier's check, *see International Furniture Distributors, Inc. v. First Georgia Bank*, 163 Ga.App. 765, 294 S.E.2d 732 (1982); *Laurel Bank & Trust Co. v. City Nat. Bank of Connecticut*, 33 Conn.Sup. 641, 365 A.2d 1222 (1976); *Wilmington Trust Co. v. Delaware Auto Sales*, 271 A.2d 41 (Del.Ch.1970); *Leo Syntax Auto Sales, Inc. v. Peoples Bank & Sav. Co.*, 6 Ohio Misc. 226, 215 N.E.2d 68 (C.P.1965); *See also In Re Johnson*, 552 F.2d 1072 (4th Cir.1977); *TPO, Inc. v. Federal Deposit Ins. Co.*, 487 F.2d 131 (3d Cir.1973); *Banco Ganadero y Agricola, S.A. v. Society Nat. Bank of Cleveland, Ohio*, 418 F.Supp. 520 (N.D. Ohio 1976). The defense is also available to the drawer of a check as against the payee. *Bank of Wyandotte v. Woodrow*, 394 F.Supp. 550, 555 (D.C.Mo. 1975).

The bank is a party with whom Roberts has dealt, because Roberts took the bank disbursement check directly from the Bank. Roberts did not, as against the Bank, take

the check free of the defense of lack or failure of consideration. Because the Steinmeier check was without value, there was no consideration for the Bank's promise to pay and the Bank is not liable to Roberts on the bank disbursement check.

Judgment affirmed.

All concur.